387 A.2d 877

COMMONWEALTH of Pennsylvania

v.

Henry T. REEVES, Carlton Brown, Robert Mangini, Michael Moffo, Frank Mawhinney, Joseph C. Ford, Carl K. Henry, Appellants (two cases).

Superior Court of Pennsylvania.

Argued March 19, 1976.

Decided April 28, 1978.

410

Robert F. Simone, Philadelphia, for appellants.

William T. Nicholas, First Assistant District Attorney, Norristown, for Com., appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Justice:

The instant appeal arises from the conviction of the seven appellants, after a jury trial, of various charges ranging from riot, riotous destruction of property, and malicious destruction of fences, to conspiracy and assault. The trial itself, which began on January 21, 1974 and ended on April 10, 1974 established the following facts, generally.

Prior to June 5, 1972, Altemose Construction Company had won the bid on a construction project, a complex of buildings in Upper Merion, Montgomery County, Pennsylvania, the principal building of which was to be a hotel. It was a large project, especially for a construction company such as Altemose which operates as an "open-shop" with an overwhelming majority of non-union employees. Indeed, the success of Altemose Construction Company had long been a matter of considerable concern to the Philadelphia Building and Trades Council (BTC), which had taken the position that Altemose's cost-cutting employment of non-union labor was destroying the prevailing wage standards in the Philadelphia area. Thus it was, on June 5, 1972, that workingmen affiliated with the BTC came in busloads and carloads, almost 1,000 strong, to the Upper Merion jobsite, ostensibly to picket.

Although most of the men peacefully picketed on the perimeter of the jobsite while wearing placards declaring their grievance against Altemose, hundreds of others set out immediately to destroy the completed preliminary work, and the equipment which was on the site, much of which belonged to A. J. Volpi Construction Company, a subcontractor for Altemose. By their sheer weight they trampled down thousands of feet of cyclone fencing. Temporary office

modules of fiberglass, trailers and heavy equipment were set afire and demolished. Security personnel and the police chief of Upper Merion Township and others were stoned. In all, some $300,000 worth of damage was done in little more than an hour's time. When the violence was done, and the project lay smoldering and completely destroyed, the perpetrators rejoined those picketing peacefully around the perimeter of the site.

Although the number of the people involved in both the peaceful and violent activity and the fact that virtually all were strangers in Upper Merion combined to make identification of those responsible for the damage difficult, eventually twenty-three men were sufficiently identified to lead to their arrest and trial. It is from the trial of nine of the twenty-three that the instant appeal arises.[1] Two of the nine defendants, Donald Offner and Clinton Holmes, were acquitted by the jury, and all of the men tried herein were members of Local 30, Roofers Union, an affiliate of the BTC.

First, two of the appellants in the instant case, Carl Henry and Henry Reeves, argue that the evidence at trial was insufficient to sustain the verdicts of guilty against them for riot, malicious destruction of fences, and conspiracy. Of course, as has been frequently stated, the scope of appellate review concerning the sufficiency of evidence is indeed limited:

"The scope of review of an appellate court determining the sufficiency of the evidence is limited to deciding whether, accepting as true all evidence, direct or circumstantial, and all reasonable inferences arising therefrom upon which the trier of fact could have properly based the verdict, the evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Miller*, 234 Pa.Super. 146, 339 A.2d 573 (1975).

1. Appeals from the trial of the remaining fourteen men, which was severed prior to the trial in the instant case, are also currently pending before this court.

Nevertheless, with respect to appellants Henry and Reeves, we agree that the evidence was not sufficient to sustain the jury's verdict.

There is no need to expound at length on the elements of malicious destruction of fences and conspiracy because, given the nature of the Commonwealth's evidence and its strategy, if it failed to prove riot against Henry and Reeves, *a fortiori*, it failed to prove the other offenses.

The Commonwealth's proof of riot against Henry was largely based upon a photograph taken at the scene of the rioting which depicts Henry running along side of the fence which was being trampled down. Coupled with Henry's membership in the Roofers Local, the Commonwealth argues that it has adequately demonstrated Henry's opportunity, disposition and motive to commit riot to sustain the jury's verdict. In particular, the Commonwealth argues that the jury could infer that Henry had been alternately jumping onto and from the fence, and that the cameraman happened to take the picture while Henry was only running beside the fence. This argument is so patently conjectural, we are surprised the Commonwealth thinks it persuasive. Insofar as the evidence against Henry is concerned, one could also conjecture that he was running along the fence urging his comrades to dismount it and stop breaking the law. In any event, this is precisely the kind of guesswork or conjecture which the law prohibits a jury from engaging. "[S]uspicion is never accepted in a court of justice as a substitute for proof." *Commonwealth v. New*, 354 Pa. 188, 193, 47 A.2d 450, 457 (1946). Especially in light of the fact that many of the men at the scene of the destruction were not involved in violence, and were picketing peacefully, surmising from Henry's presence at the scene that he was a participant in the violence, simply because he was a member of the Roofers Local, is impermissible.

It is true that there is language in some cases which suggests that a person's mere presence at the scene of a riot, if he is not engaged in suppressing it, is sufficient to sustain a verdict of guilty for rioting. For example, by way

of dictum in *Commonwealth v. Hayes*, 205 Pa.Super. 338, 343, 209 A.2d 38, 40 (1965), this court stated: "In fact, all persons who are voluntarily present and not assisting in the suppression of a riot, where their presence tends to encourage the rioters, shall be prima facie inferred to be participants." However, the reported case law in Pennsylvania demonstrates that more than mere presence is needed to prove riot beyond a reasonable doubt. *Commonwealth v. Hayes*, itself, involved a man who had been threatening police and giving directions to the rioters. In *Commonwealth v. Abney*, 195 Pa.Super. 317, 171 A.2d 595 (1961) the defendants were caught in the acts of violence which constituted the riot. In *Commonwealth v. Safis*, 122 Pa.Super. 33 (1936), the defendants were proven to have verbally incited the crowd to violence. Thus, *obiter dicta* aside, the cases indicate that more than presence at the scene is required to prove riot. We conclude that the better view is that expressed by this court in *Commonwealth v. Merrick*, 65 Pa.Super. 482, 489 (1917): mere presence without proof of encouragement is not sufficient to prove riot. See also 2 Wharton's Criminal Law & Procedure § 865 (Anderson ed. 1957). Insofar as Mr. Henry was concerned, without conjecture or guesswork, one cannot conclude beyond a reasonable doubt that he was engaged in riot. See *Commonwealth v. Long*, 470 Pa. 204, 368 A.2d 265 (1977).

█ Similarly, the evidence against Mr. Reeves was insufficient. The pictures demonstrating his presence at the scene were taken after the destruction was complete and do not depict him as engaged in any act of violence or encouragement. Hence, there being no proof that Reeves either engaged in or encouraged the violence, the jury's verdict of guilty cannot stand.

Among numerous issues raised on this appeal, the remaining appellants contend that the lower court erred in denying their motion for sequestration of the jury because the court did not fully appreciate the nature and character of the prejudicial implications of the publicity reported in newspapers and over radio and television stations prior to and

during the trial. Furthermore, appellants complain that, absent sequestration, the trial court did not sufficiently and adequately inquire of the jury as to whether or not they had heard, read or listened to news, and if so, to inquire as to what influence this news would have on their impartiality. We agree and order a new trial.[2]

There was a considerable flow of publicity about this case, to say the least, over radio, television and more than one hundred newspaper accounts continuing for a period of almost 22 months from the time of the incident on June 5, 1972, through the trial which began on January 21, 1974 and ended on April 10, 1974.[3] Indeed, photocopies of newspaper articles alone, many of which were partisan and vitriolic, filled more than one volume of this exceedingly lengthy record. As trial approached, typical headline stories in various newspapers covering the Philadelphia, Montgomery and adjoining county areas ran as follows:

"Security Tightened For Trial of Unionists"

This was a headline to a November 27, 1973 story in "Today's Post," a Montgomery County newspaper, appearing the same day on which pre-trial proceedings began in this case. The story related how Montgomery officials

2. In light of our findings on sequestration and change of venue we shall not discuss the other issues raised by defendants. These issues dealt with prosecutorial misconduct, denial of a motion to change venue, the use of particular photographs by the prosecutor in his summation to the jury, trial court error with respect to admissibility of evidence, and trial court abuse of its discretion in allowing the jury to continue deliberations when two jurors became ill.

3. Appellants referred us to numerous of the earlier articles which, if fresh in the memory of the jurors, would undoubtedly have denied appellants a fair trial. However, the court's pre-trial voir dire of the jury revealed that its impartiality had not been tainted by the earlier reports. Since most of these more inflammatory reports were published shortly after the rioting, i. e., more than one year before trial, we are constrained to agree that the court did not abuse its discretion in refusing to grant appellant's change of venue. See *Commonwealth v. Hoss*, 469 Pa. 195, 364 A.2d 1335 (1976); *Commonwealth v. Powell*, 459 Pa. 253, 328 A.2d 507 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680 (1974); *Commonwealth v. Swanson*, 432 Pa. 239 (1968), *cert. denied*, 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969).

would "beef up security measures" throughout the Montgomery County Court House during pre-trial proceedings involving the nine accused in this case of taking part in the riot of June 5, 1972, on the King of Prussia construction site. In the story, Sheriff Jeremiah P. Delaney of Montgomery County, was quoted as saying that he didn't expect a large crowd "but we'll be ready just in case." The Sheriff also pointed out that he would not allow pickets to remain outside the court house because that would be against the law and it would be obvious that the pickets would be "attempting to influence the judge or the jury." There was no information whatsoever in the story that any demonstration of any kind had been planned or by whom it was being planned.

"9 Men Charged In Labor Strife Go On Trial"

This headline in the Times Herald, Norristown Times or Norristown Daily Herald (these three names apply to the same paper), appeared on November 27, 1973, also on the first day of the pre-trial proceedings. This story tells of two newspaper photographers' cameras being smashed on that day when the photographers attempted to take pictures of people walking into the Montgomery County Court House. There was no evidence in the story that there was any connection between the event described in the story and the defendants who were about to go on trial.

Another prejudicial headline published in "Today's Post" on March 15, 1974 read:

"TELEPHONE SCARE HALTS ALTEMOSE LABOR TRIAL"

This headline also demonstrates the supercharged atmosphere surrounding the trial to which the jury was repeatedly exposed.

On January 22, 1974, on the second day of the trial, appellants' counsel pointed out to the trial court that the Philadelphia Inquirer newspaper carried a statement by the district attorney for Camden County, New Jersey, which accused the Roofers Union Local 30, the union to which defendants belonged, as being linked to the Mafia.

Throughout the trial there were radio broadcasts and newspaper items concerning various aspects of the trial. For example, on January 31, 1974 the District Attorney proposed that a suppression hearing that had been heard prior to the trial be reopened to allow a Culvirt Quitman to testify. The trial court granted the motion and suspended the trial for several days in order to hear what was proposed to be Quitman's testimony on the identification of one of the defendants. Defense counsel objected and moved to have the jury sequestered (a motion in which all defendants ultimately joined) on the grounds, first, that interrupting the trial would unduly focus attention on Quitman's testimony and, second, would inevitably lead to prejudicial publicity and the exposure of the jury thereto. Although defense counsel's objections were overruled, their prediction of prejudicial publicity proved true. Prior to the court's ruling on the Quitman testimony, and during the time fixed for his testimony, highly prejudicial and inflammatory publicity over radio and in newspaper accounts was brought to the attention of the court by defense counsel by their virtually continuous motions for sequestration of the jury. During many of the days when publicity was being disseminated in the newspapers and over radio and television stations, the trial court failed to admonish the jury concerning its duty not to read or listen to the news and failed to conduct an inquiry into what, if anything, the jurors might have heard concerning publicity which might affect their impartiality.

The central theme of many news stories appears to be that what occurred at the Altemose site on June 5, 1972 sparked a wide-spread and even multi-state conflagration of union violence and destruction, and that whoever participated in the June 5 riot should be held accountable for these occurrences. Since it was these nine defendants who were on trial during all the publicity, the attention of the public, drawn as it was to those stories of violence and destruction, converged on these particular nine defendants. While, certainly, the despicable and revolting conduct of men who destroyed the property on the Altemose site is not to be

condoned or underestimated, insofar as the appellants are concerned (in an incident involving 1,000 participants), their guilt or innocence was a matter to be decided at trial and not in the news media prior to or during the trial.

Although the news media must be given a wide latitude in reporting material about criminal trials, since the foundation of our society rests on freedom of thought and discussion, the publication of news accounts cannot interfere with the orderly administration of criminal justice. Mr. Justice Holmes stated seventy years ago the following in *Patterson v. Colorado*, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 (1907):

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

In *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976) our Supreme Court said:

> "Procedure to be followed to ensure a fair trial in the face of prejudicial publicity is clearly within the sound discretion of the trial court. Because the choice of procedure involves the balancing of fundamental rights—the defendant's right to a fair trial before an impartial jury and the rights associated with a free press—this discretion must be exercised with care."

So, this question of the public right to know what is occurring in the community, as against a person's right to a fair trial, poses a difficult problem to decide as a legal principle. The most that can be said is that each case depends on its facts. The presentation of facts by the news media at the time a crime has occurred usually poses no question of unfairness to a defendant and his right to have a fair trial. But, the presentation of facts and innuendoes repeated many times, and colored with a variety of interpretations and convoluted versions over and over again on television, radio, and in newspaper accounts, prior to and during the trial, may have a drastically adverse effect on a person's right to a fair trial. This is so, since, during a trial, if an accused is presented in the news media as a danger, a

threat, or a scourge to the community, he may be foreclosed from enjoying a fair trial if the jury learns of these accounts.

In the case of *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973), in which it appeared that much of the news publicity covered a street attack which resulted in the killing of one of two victims, the Court said:

> "While much of the publicity was routine, factual, and wholly lacking in inflammatory content, a great deal of publicity about Pierce was emotionally charged and inflammatory, and clearly pointed to his guilt."

The court in *Pierce* reversed the conviction and granted a new trial. Although the defendants in the instant case were not individually mentioned in all of the stories, many of which were factual and many of which were emotionally charged and inflammatory, it would strain credulity to say that it was possible for a reader or listener to separate the individual defendants from their union with respect to the stories reported by the news media.

Therefore, because of the continuous flow of prejudicial publicity during the trial concerning which the court was reluctant to repeatedly interrogate the jury, we find the court abused its discretion in not granting the frequent motions and requests of defense counsel for sequestration of the jury. The flow of news coming over the radio stations and in newspapers dictated a sequestration in order to preserve the impartiality of the jury, if only for the time during which the court itself acknowledged, concentrated publicity would be forthcoming.

In *Commonwealth v. Bruno*, supra, the trial court, in a five-day trial, instructed the jury four times on its duties not to expose themselves to any publicity concerning the trial, to consider only the evidence presented to them at trial, and to report anything to the court which would affect their ability to continue as jurors. One of the cautionary instructions, following a disclosure to the court by the defense that a newspaper headline announced, "Bruno Trial Jury Seated, Alleged Confession Out," was as follows:

"Members of the jury, remember my admonition about discussing the case among yourselves or anyone else or exposing yourself to anything concerning this case. Read a good book tonight instead of reading the newspaper or watching television and listening to the radio. That's a suggestion. It's a suggestion of how to occupy yourselves, *not a suggestion as to what you should not do.* I will see you tomorrow morning." (Emphasis added.)

At another point in the trial, after defense counsel informed the court that four newspaper articles alleged that Bruno's confession would not be heard at trial, and that a local radio station had given extensive coverage to the trial procedure, the court said the following to the jury:

"Don't discuss this case among yourselves or with anyone else, members of the jury and remember my admonition about exposing yourselves to anything you should not expose yourselves to in connection with this case."

On two other occasions the court gave similar reminders to the jury. Despite these cautionary instructions on the part of the trial court in the *Bruno* case, the Supreme Court of our state said:

"At no time prior to the end of the trial on February 4, 1974, were the jurors questioned concerning their exposure to the publicity which occurred during the trial. The jury was not specifically instructed to refrain from looking at newspapers and listening to the radio and television. Instead, they were given a mere 'suggestion' to read a book. They were told only once, before the publicity concerning appellant's confession was brought to the court's attention, that they should report any incident to the court that might affect their judgment. Despite repeated defense motions, the court made no meaningful attempt to ensure the jury was not influenced by the suppressed, but widely publicized, confession."

In the instant case, on the first morning of trial, January 21, 1974, and before the noon recess, the trial court gave these cautionary instructions to the jury:

"In the meantime, you will recall my instructions to you just before you left the stand here when you were voir dired and has also been mentioned by counsel, you must avoid talking about the case with anyone; you must avoid reading about it; try to keep your minds just as clear as they can be so that you can do justice in this case on the basis of the evidence that you will hear in this courtroom and that alone."

On the next day of the trial, January 22, 1974, defense counsel pointed out to the lower court that the Philadelphia Inquirer newspaper carried a statement by the District Attorney for Camden County, New Jersey, accusing the Roofers Union Local 30, the union to which defendants belonged, as being linked to the Mafia. This story, of course, was a serious indictment of the Roofers Union Local and its members, and the jury's reading it would have been extremely prejudicial to the rights of the nine defendants to have a fair trial. The minimal standards of constitutional due process guarantees to the criminally accused a fair trial by a panel of impartial and "indifferent" jurors. *Commonwealth v. Stewart*, 449 Pa. 50, 52, 295 A.2d 303 (1972), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974). If the defendants in this case had been able to show that this "Mafia" story had reached the jury, its highly prejudicial nature could, per se, have been grounds for a new trial. Cf. *Commonwealth v. Hawkins*, 459 Pa. 196, 328 A.2d 156 (1974). Thus, upon the basis of defense counsel's motion for mistrial, the court had a particular duty not only to admonish the jury against the listening, reading or looking at news reports, but also to take precautions to conduct a careful inquiry of the jury to determine if any news concerning the Mafia story had been received by the jury and, if so, what effect it had upon their impartiality. Instead, the court in a most general and ambiguous manner interrogated the jury as to whether they had read anything in the papers concerning Roofers Local 30, or anything about either the Altemose Construction Company or J. Leon Altemose. Although one juror raised her hand saying that she had read a story about

her selection as a juror, the other members of the jury did not indicate that they had read anything. The very fact that one juror read in the newspaper that she had been selected as a juror, was proof that the court's earlier admonition had not been effective, and that a more careful inquiry of all the jurors was called for.

The exact procedure of inquiry which a trial court should pursue to determine the impartiality of a jury in face of inflammatory publicity is set forth in *Commonwealth v. Bruno*, supra, in which the court stated:

"The court gave an inadequate precautionary instruction to the jury and took no direct action to ensure that they were not exposed to such highly prejudicial information. In such circumstances, the trial court should have questioned each juror as appellant's counsel frequently requested to ensure that the publicity had not in fact reached the jury. The failure to do so denied appellant any chance to show actual prejudice. Such a procedure is required, upon the request of either party, under the ABA Standards Relating to Fair Trial and Free Press § 3.5(f):

'If it is determined that material disseminated during the trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material . . . .' "

The American Bar Association's Standards for Fair Trial and Freedom of the Press, regarding questioning jurors about the exposure to potentially prejudicial material in the course of the trial, Standard for Excusing a Juror, § 3.4(a), adopted in *Commonwealth v. Bruno*, supra, provides:

"An accurate record of this examination shall be kept, by a court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude toward the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have."

This precaution of course could apply equally well to the questioning of a juror during a trial. In the instant case, at the end of the day during which the Mafia story was revealed, the trial court dismissed the jury without any admonition and without any specific inquiry being conducted.

In *Janko v. United States*, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (1960), the Supreme Court reversed the Eighth Circuit Court of Appeals when the circuit court found that the district court trial judge had not erred in refusing a defense motion for mistrial based on grounds that a prejudicial newspaper article appeared during the two-day trial. On the second day in the *Janko* trial, defense counsel presented to the court a story printed in an evening newspaper of the preceding day. The headline read:

"J. W. Janko on trial on income tax case"

In the body of the story were references to the defendant as "a former employe of East Side Rackets Boss Frank (Buster) Wortman," and as a "former convict." In another story on the page, appeared the language, "Gang Boss Frank (Buster) Wortman." In *Janko*, too, the court made a general inquiry concerning the jury's knowledge of the newspaper story which was found to be insufficient by the Supreme Court.

With respect to Culvirt Quitman's purported identification testimony, during the court's consideration of defense counsel's motions for mistrial or sequestration of the jury, Mr. Peruto, one of the defense counsel, said to the court:

". . . and specifically with regard to Quitman in particular the radio has been saying over and over that the Commonwealth has produced a series of witnesses none of whom could identify any of the defendants."

"And the broadcast seems to point out—they question Mr. Nicholas [4] about what's happening, when is somebody going to be identified. And they quote Mr. Nicholas as saying—and I don't mean to say Mr. Nicholas made this

4. Mr. Nicholas was the assistant district attorney for Montgomery County, and in charge of the prosecution in the instant case.

quote, I'm just pointing to the prejudicial effect of the broadcast itself—that they quote Mr. Nicholas as saying that it was necessary to proceed in this fashion but that it's a two-phased prosecution and that this .phase that they are now entering will be the phase where there will be positive identification. Now the point is that the press has been repeating the story of no identification over and over, to where they have built it to the point where there will be almost certain explosive prejudicial publicity when they finally get to an identification witness such as Quitman."

Nevertheless, the trial court refused to sequester the jury and granted a reopening of the suppression hearing in order to hear Mr. Quitman outside the hearing of the jury. Furthermore, on the morning of February 4, 1974, defense counsel pointed out to the court that the radio and news broadcasts, especially radio station KYW which was broadcasting the story every fifteen minutes, stated that the trial judge would be ruling on whether or not a "surprise witness" would be allowed to testify and identify one of the defendants. Mr. Peruto said to the court:

"The import of the broadcast was clearly that there is an identification witness, his name was Quitman and gave the impression that the jury had been recessed for two days for the defense to attempt to keep his testimony out of the case."

Mr. Peruto further stated:

"[A]s has been announced by Stanford Shmuckler, the attorney for Mr. Quitman, it is his intention to plead the Fifth Amendment, that we will be getting broadcasts of a similar nature, I'm afraid, and then the defendant will be prejudiced no matter which way it goes."

After this information the court again failed to give proper cautionary instructions to the jury when it was excused for the duration of the Quitman inquiry.

The case of *United States v. Powell*, 171 F.Supp. 202 (M.D.Cal.1959) speaks pointedly on this issue.

"There is a further and even stronger reason for the granting of a motion for mistrial. Courts, particularly in criminal cases, are zealous in protecting the rights of a defendant against the possibility of a jury being influenced by non-evidentiary matters. Consequently, it has been traditional to excuse the jury, and to keep from their ears arguments on legal matters such as the admission of evidence. This we did in this case. Nevertheless, the press, in disregard of the worthy purpose above stated, published and disseminated that which the court had kept from the ears of the jury. In this respect even those newspaper accounts which in whole or in part accurately reported the discussion between Court and counsel in the absence of the jury in respect to the admissibility of the proposed testimony created a danger of an improper and prejudicial influence upon the jury."

After a week-end press coverage on the Quitman matter, defense counsel again moved for a mistrial or sequestration of the jury. After that week-end press coverage, on February 4, 1974, a Monday, the following colloquy occurred:

"THE COURT: Can we agree that there is likely to be some additional publicity?

MR. PERUTO: Yes, sir.

THE COURT: I don't see any point now this morning in trying to make any inquiry at all because there is going to be more.

MR. SIMONE: Finally, your honor, in honor of your honor's own statement that we are all in agreement that there is going to be additional publicity in question with this matter, I renew my motion to sequester the jury.

THE COURT: I do not consider the situation of that magnitude, so the motion's denied.

MR. MOORE: Subsequent events have proved it necessary for sequestration.

THE COURT: In the judgment of the defense counsel, I understand that to be so."

■ As it turned out the trial court sustained Quitman's exercise of his Fifth Amendment right not to incriminate himself; and on February 5th, what was acknowledged the day before by the trial court concerning publicity, unfortunately became a reality. On that day defense counsel called to the attention of the court that again the news broadcasts over radio had "been blaring intermittently and never missing an hour, constantly referring to the Quitman testimony and the plea of the Fifth Amendment and the refusal to testify." On that same day defense counsel offered into evidence Exhibit "P–14" which was a front-page story from a Montgomery County edition of "Today's Post" referring to Quitman's pleading the Fifth Amendment. This story was typical of the news broadcasts and newspaper stories regarding this matter. The headline read:

"Bus Driver Pleads Fifth"

"State's Key Witness Refuses to Testify"

The story narrated the following. "A bus driver undercut the prosecution in the Altemose trial, Monday afternoon, by invoking the Fifth Amendment and refusing to testify against one of the nine defendants. The text of the story was consistent with the damaging import of its headline. This story, the defense alleged, indicated that for one reason or another, the defense didn't want Quitman to testify, and, perhaps, intimidated him into pleading the Fifth Amendment. Whether this view was meritorious or not, the story was sufficiently important to bring to the attention of the trial court again the seriousness of the continuing publicity of the trial. Especially considering that the Quitman episode occurred while the trial was suspended and the jury excused, it is our opinion that the trial judge failed to exercise sound discretion in not, at the very least, admonishing the jury concerning its duty to avoid publicity of the case and in failing to conduct an adequate inquiry into what news, if any, the jury had heard.

On February 18, 1974, one defense counsel addressed the court as follows:

"MR. SIMONE: Your honor, on Friday morning I was aware of a newspaper article that appeared in the Philadelphia Inquirer on Thursday night, Friday morning, which I will get a copy of and make an exhibit, which indirectly spoke of this trial. But directly, the headline was that the union roofers beat up non-union roofers over in Jersey, in Camden. And then it went on to say that the members of Local 30 are on trial for the same type of activity."

On the basis of this report defense counsel reiterated its request for sequestration which was again denied. And, on March 14, 1974, the court house was evacuated due to a "bomb" threat. The following day, the headlines in "Today's Post" read: "Telephone Scare Halts Altemose Labor Trial." During most of these events the trial court failed to advise the jury as frequently as we are of the opinion it was necessary to do to avoid contact with any publicity and not to discuss the case with anyone and to report any information it received to the court. In *Smith v. State*, 317 A.2d 20 (Del.1974), the Delaware Supreme Court stated:

"In our view, for the integrity of the trial and in the interests of justice, the Trial Judge should, at the end of each day, caution the trial jury collectively about avoiding accounts of the proceeding which may appear in the news media, including newspapers, radio and television. At the commencement of each new trial date, the court should inquire of the jury, collectively, as to whether any member has in any way been exposed to such accounts."

It is difficult to deny that this case was of such notoriety and the issues were of such a nature that, in the absence of sequestration, highly prejudicial matters were likely to come to the attention of the jurors, thereby depriving these appellants of a fair trial. Without adequate admonition and without adequate inquiry into the possible influence of adverse publicity, the potential is too great that the jury had come into contact with some of the news that was prevalent and which was continuously being disseminated during the trial throughout the community. On that basis, circum-

stances dictated a sequestration of the jury in order to insure an impartial jury.

Pa.R.Crim.P. 1111 provides the guidelines for determining the sequestration issue.

"The trial judge may, in his discretion, order sequestration of trial jurors in the interest of justice.

.    .    .    .    .

(b) When sequestration is ordered, each juror, including any alternates, shall be sequestered from the time of acceptance as a juror until discharged.

(c) Nothing in Subsection (b) shall prevent a trial judge from ordering sequestration, or vacating his order of sequestration, at any time during a trial when the interests of justice require."

Section (c) of the above rule makes it clear that the sequestration of a jury does not necessarily have to continue from the time of the order of sequestration to the end of the trial, but that sequestration may be vacated in the exercise of the proper discretion of the court when the danger of any influence upon the jury because of prejudicial publicity has abated. Although the matter of sequestration of a jury is within the sound discretion of the trial court; *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975); *Commonwealth v. Swanson*, 432 Pa. 293, 248 A.2d 12 (1968); there are situations where the adverse publicity is so pervasive, intense and prejudicial, that the law presumes that the jury's deliberations were affected by it. See, e.g., *Commonwealth v. Bruno*, supra. In *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) where there was no direct evidence that any deputy sheriffs had talked with any members of the jury, the Supreme Court of the United States overruled the trial court's denial of a motion for mistrial, stating:

"[T]he potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality."

Similarly, in *Commonwealth v. Stewart,* 449 Pa. 50, 295 A.2d 303 (1972), there was no evidence that the murder victim's father, who was on the panel of jurors from which the trial jury had been selected, had at any time spoken to any of the jurors about the case. The trial court denied a defense motion for the withdrawal of a juror without a hearing or an inquiry as to whether any of the jurors selected to hear the case had any conversation or association with the victim's father before being accepted as jurors in the case. There our Supreme Court in reversing and granting a new trial said: "We realize that what we are in effect doing is presuming prejudice for the sake of insured fairness; however, this is exactly what the United States Supreme Court did in *Turner* . . . ." These cases and others strongly indicate that if there is a substantial potential for depriving an accused of a fair trial because of extrajudicial information of an emotional and inflammatory nature, even though there is absent direct evidence of jury prejudice, the accused is entitled to a new trial. See *Commonwealth v. Bobko,* 453 Pa. 475, 309 A.2d 576 (1973); *Commonwealth v. Trapp,* 217 Pa.Super. 384, 272 A.2d 512 (1972); *Commonwealth v. McDaniel,* 217 Pa.Super. 20, 268 A.2d 237 (1970). See also *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

The preferred procedure when highly prejudicial material is disseminated throughout the community where the trial is being held is either to sequester the jury or question the jurors individually outside the presence of the other jurors. *Commonwealth v. Bruno,* supra. See *United States v. Schrimsher,* 493 F.2d 848, 854 (5th Cir. 1974); *Mares v. United States,* 383 F.2d 805, 809 (10th Cir. 1967); *Margoles v. United States,* 407 F.2d 727, 737 (7th Cir. 1969), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). *Smith v. United States,* 236 F.2d 260, 269–70 (8th Cir. 1957); ABA Project, Standards Relating to Fair Trial and Free Press § 3.5(e) & (f), Commentary (App.Draft 1968).[5] Here, because the trial court failed to take the necessary precau-

5. "Reported decisions indicate that jurors will often answer candidly when carefully questioned and when the atmosphere is not condu-

tionary measures as we have stated above, there is a strong possibility that as stated in *Commonwealth v. Bruno*, supra, there was present "inherently prejudicial" news in the articles and radio and television broadcasts publicizing two of defendants' criminal records; casting a general impression that the defendants were members of a dangerous criminal organization; and, impugning the defense strategy of keeping from the jury certain information which was inferentially damaging to the defense. Considering that this all happened while the jury was not sequestered and not properly instructed or questioned, especially during the days when the trial was suspended, we find that the trial court's denial of the motion for sequestration of the jury, without predicating that decision on adequate cautionary instructions and without proper inquiry into all the matters that came to its attention concerning the publicity of this case, was an abuse of its discretion.

With respect to appellants Henry and Reeves, the judgments of sentence are reversed and appellants are discharged. With respect to the remaining appellants, the judgments of sentence are reversed and the case is remanded for a new trial.

SPAETH, J., files a concurring opinion.

PRICE, J., files a dissenting opinion in which JACOBS, President Judge, joins.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

cive to intimidation. It is important, however, that the method of separate questioning . . . be followed here and that the court not adopt a practice such as that employed in *Smith v. United States*, 236 F.2d 260, 269 (8th Cir. 1966) where a trial judge asked anyone who 'violated the instructions of the court' to raise his hand. The necessity of separate questioning has been emphasized in several cases, notably in *United States v. Accardo*, where the appellate court stated: 'There is no certainty that the jurors would volunteer information about violating the admonitions or admit that they were influenced by the publicity. . . . [I]ndividual interviews would have tended to overcome reluctance to speak out.' [*United States v. Accardo*, 298 F.2d 133, 136 (7th Cir. 1962).]" *Id.*, Commentary at p. 147.

SPAETH, Judge, concurring:

I concur in the result reached by Judge CERCONE but would award appellants a new trial for the following different reasons.

The district attorney's remarks during his closing argument exceeded the bounds of professional propriety and were prejudicial to appellants. *Contra*, Dissenting Opinion at 461–470. This is true especially in regard to the district attorney's characterization of appellants as a "mob" and as "criminals [to be brought] to justice." *Id.* at 463. Further the district attorney drew an impermissible inference from the evidence that the individuals capable of participating in the destruction of property at the construction site were also capable of injuring someone's person, and that therefore the refusal to divulge the identity of an informant were justified. *Id.* at 464–465.

The award of a new trial is also required because appellants were denied a fair trial by the prosecutor's failure to disclose that Marino had testified mistakenly at the hearing on the defense motion for the disclosure of the names and whereabouts of all witnesses known to the prosecution, and that in fact, as he subsequently realized, Marino knew the identity of his informant. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This informant was a civilian eyewitness to the incident and might have provided evidence material to appellants' defense. *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967). Since Marino informed the prosecutor that he had testified mistakenly at the hearing at least a month and a half before trial commenced, the prosecutor had ample opportunity to inform the court of the error.

PRICE, Judge, dissenting:

On June 5, 1972, rioters destroyed much of the property located on a large construction site in Montgomery County. On April 10, 1974, the seven appellants, after a lengthy trial, were convicted of various charges arising from this incident. Timely post-verdict motions were denied by the court below. This appeal followed.

In 1972, the Altemose Construction Company (Altemose) had been awarded a contract to construct the Valley Forge Plaza, a large building complex consisting of a Sheraton Hotel, an office building, and two theaters. Altemose's designation as general contractor for this lucrative project particularly distressed the Philadelphia Building and Construction Trades Council (BTC) which believed that Altemose's practice of employing non-union help was destroying prevailing Philadelphia wage standards. Thus, on June 5, 1972, approximately one thousand protesters sympathetic to the BTC converged upon the Plaza construction site to protest Altemose's "open shop" employment policy. Unfortunately many of those present at this protest took it as an opportunity to signify their opposition to Altemose by destroying the site.

The protesters arrived at the Plaza site at about 7:30 a. m., a few in cars and most in buses chartered by the Roofers' Union, Local 30, of the BTC. Hundreds of these men, observed by hopelessly outnumbered local police and other bystanders, moved immediately to trample the entire length of a chain link fence, eight feet high, which encircled the twenty-four acre site. As segments of the fence would collapse under the weight of these men, groups of them, reacting to whistles, hand signals, and shouts, would penetrate the interior of the site. Within an hour, these men, amidst the fury of exploding smoke grenades and firecrackers, firebombed and destroyed a fiberglass office building, a guard shack, a construction trailer, several trucks, and stores of lumber. Cheering and exultant, they beat bulldozers with iron bars. They slashed hoses and tires and extracted survey markers and electrical fixtures. In all, they destroyed approximately $300,000 worth of property. Moreover, they stoned two security guards and a local policeman. They also assaulted another local policeman who attempted to restrain a stone thrower.

At approximately 9:00 a. m., a large force of State Policemen arrived at the Plaza site. Firefighters, previously restrained by local police, were allowed to enter the con-

struction area. By this time, however, those men who had engaged in destructive activities had left the site and had joined with other protesters who were picketing along the western and southern borders of the site.

The frenzied destruction of the Plaza construction site ultimately resulted in the arrest and trial of twenty-three men. Nine of these men were tried collectively. Two of the nine men, Donald Offner and Clinton Holmes, were acquitted by the jury. The other seven men, all members of Local 30 of the Roofers' Union, an affiliate of the BTC, now appeal their conviction of various charges. I would affirm the judgment of sentence of the court below.

The appellants raise nine issues before this court. I will consider each issue seriatim.

## I

Two of the appellants, Carl Henry and Henry Reeves, contend that the evidence adduced by the Commonwealth at trial was insufficient to sustain their convictions for riot,[1] malicious destruction of fences,[2] and conspiracy.[3] The majority agrees that the Commonwealth failed to prove that Henry and Reeves participated in a riot and therefore concludes that, "a fortiori, [the Commonwealth] failed to prove the other offenses." I believe that the majority overlooks much of the evidence produced by the Commonwealth against the appellants. I would affirm the convictions of both of these appellants.

Since the acts in question were committed prior to the June 6, 1973 effective date of our current Crimes Code, the appellants were charged under the 1939 Penal Code. Although Section 401 of the Penal Code provided that anyone who "[p]articipates in any riot, . . . , is guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to imprisonment not exceeding three (3) years, which

1. Act of June 24, 1939, P.L. 872, § 401 (18 P.S. § 4401).

2. Act of June 24, 1939, P.L. 872, § 940 (18 P.S. § 4940).

3. Act of June 24, 1939, P.L. 872, § 302 (18 P.S. § 4302).

imprisonment, may be at separate or solitary confinement at labor, or to pay a fine not exceeding one thousand dollars ($1,000) or both," Act of June 24, 1939, P.L. 872, § 401 (18 P.S. § 4401), the statute did not define the offense of riot.[4] The courts of this Commonwealth therefore have resorted to the common law to provide meaning to the crime.[5] Thus, a riot " '[has been] commonly defined as a tumultuous disturbance of the peace by three or more persons assembled and acting with a common intent; either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.' " *Commonwealth v. Hayes*, 205 Pa.Super. 338, 340, 209 A.2d 38, 39 (1965), *quoting Commonwealth v. Kahn*, 116 Pa.Super. 28, 31, 176 A. 242, 243 (1935).

In applying the common law definition of riot, Pennsylvania courts have not required specific proof that the violence which actually occurred resulted from the original intent of the rioters. As this court stated in *Commonwealth v. Merrick*, 65 Pa.Super. 482, 489–90 (1917): "[W]hile [rioters] may not have intended the actual destruction of any particular building, or personal violence to any particular person, the law does not require such specific and particular proof. If the results which did follow, or ones similar to them in kind, should reasonably have been anticipated, the law presumes that they intended the ordinary and natural results . . ." Thus, the element of intent could be inferred from the violence which occurred, and consequently, evidence of any individual act of violence in furtherance of the common

4. Compare Section 5501 of the Crimes Code which specifically provides that: "A person is guilty of riot, a felony of the third degree, if he participates with two or more others in a course of disorderly conduct: (1) with intent to commit or facilitate the commission of a felony or misdemeanor; (2) with intent to prevent or coerce official action; or (3) when the actor or any other participant to the knowledge of the actor uses or plans to use a firearm or other deadly weapon." 18 Pa.C.S. § 5501.

5. This method of statutory construction has been accepted by the United States Supreme Court. *Heard v. Rizzo*, 281 F.Supp. 720 (E.D.Pa.), *aff'd*, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968).

436

design would be admissible against all participants in the riot. *See Commonwealth v. Zwierzelewski,* 177 Pa.Super. 141, 110 A.2d 757 (1955); *Commonwealth v. Merrick, supra.*

Similarly, Pennsylvania courts have also ruled that a defendant's participation in a riot could be inferred under certain circumstances. As Judge (now President Judge) Jacobs of this court stated in *Commonwealth v. Hayes, supra,* 205 Pa.Super. at 343, 209 A.2d at 40: "In fact, all persons who are voluntarily present and not assisting in the suppression of a riot, where their presence tends to encourage the rioters, shall be prima facie inferred to be participants. *Commonwealth v. Merrick,* 65 Pa.Super. 482" "[A]nd the obligation is cast upon a person so circumstanced, and it must be his defense, to prove his actual noninterference: Wharton's Criminal Law, 11th ed., vol. 3, p. 2054; 24 A & E Encl. of Law 972; *Lycoming Fire Ins. Co. v. Schwenk,* 95 Pa. 89." *Commonwealth v. Merrick, supra,* 65 Pa.Super. at 490–91.

Although the appellants admit that a riot occurred at the Plaza site during the morning of June 5, 1972, they deny that they participated in the riot. The majority finds that the Commonwealth's evidence established solely that the appellants were present at the scene of the riot. The majority holds that mere presence is insufficient to prove riot and therefore discharges the appellants.

While mere presence, without more, has never been considered sufficient to sustain a conviction of riot, the majority curiously interprets Judge Jacobs' statement in *Hayes* as *obiter dicta* and adopts the "better view" expressed by this court in *Merrick* that ". . . mere presence, without encouragement is not enough to establish criminality . . ." *Commonwealth v. Merrick, supra,* 65 Pa.Super. at 489. The majority is apparently unaware that Judge Jacobs' statement in *Hayes* was merely a slight rephrasing of the holding in *Merrick.* "It is further held, that in riotous and tumultuous assemblies, all persons who are present and not actually assisting in their suppression may, where their presence is intentional, and where it tends to the encouragement of the

rioters, shall be prima facie inferred to be participants . . . ." *Commonwealth v. Merrick, supra,* 65 Pa.Super. at 490.

Although the above-stated language in both cases is indistinguishable in meaning, such language was formulated in response to a factual situation different from that which now confronts us. In *Hayes* and *Merrick*, the Commonwealth established not only that the defendants were present at a riot, but also that each was a conspicuous agitator of the crowd which rioted. The Commonwealth, however, could not show that either defendant perpetrated a violent act during the course of a riot.[6] The Commonwealth asserted that both defendants were inferential participants in a riot because each had incited rioters.[7] This court agreed, concluding that the presence of Hayes and Merrick, in light of the incendiary association of each with the rioters, tended to encourage the rioters. While the measure of proof sufficient to distinguish an inferred participant from a mere onlooker must necessarily depend upon the circumstances of each case, such an analysis is not necessary in the instant case. I believe that here the Commonwealth's evidence adequately demonstrates that the appellants were actual, not inferential, participants in the Plaza site riot.

In analyzing the appellants' challenge to the sufficiency of the evidence, we must read all the evidence, whether direct

6. Under the common law, "[a]ctual force or violence [was] not an indispensable element of riot." *Commonwealth v. Paul,* 145 Pa.Super. 548, 553, 21 A.2d 421, 423 (1941). The crime was established as long as the original intent to commit an unlawful act had been accomplished and the conditions engendered by the conduct of the participants had tended to alarm law-abiding citizens.

7. In both cases, the incendiary remarks of the defendants were sufficient to convict each of the common law offense of inciting to riot. "Inciting to riot, from the very sense of the language used, means such a course of conduct, by the use of words, signs or language, or any other means by which one can be urged on to action, as would naturally lead, or urge other men to engage in or enter upon conduct which, if completed, would make a riot." *Commonwealth v. Merrick,* 65 Pa.Super. 482, 491 (1917). Inciting to riot, as a common law crime not specifically delineated in the 1939 Penal Code, was retained in its common law form as an indictable offense by the Act of June 24, 1939, P.L. 872, § 1101 (18 P.S. § 5101).

or circumstantial, in a light most favorable to the Commonwealth and give to the Commonwealth the benefit of all reasonable inferences arising therefrom. *E. g., Commonwealth v. Williams*, 476 Pa. 557, 383 A.2d 503 (1978). Before a conviction will be sustained, however, "the facts and circumstances proved must be of such a character as to establish guilt beyond a reasonable doubt." *Commonwealth v. Garrett*, 423 Pa. 8, 12, 222 A.2d 902, 905 (1966).

The Commonwealth's evidence against Henry centers around a *number*[8] of photographs which show Henry beside a group of rioters who were trampling the fence surrounding the site. Since these photographs do not show Henry either walking upon or climbing the fence, the significance of these photographs to the Commonwealth's claim against Henry becomes apparent only when the photographs are examined in conjunction with other evidence presented by the Commonwealth.

The photographs in question were taken by Mr. Ditmar Hahn, an employee of SKF Industries (SKF), from the parking lot of the SKF plant. Mr. Hahn testified that he arrived at the SKF lot, which is adjacent to the east border of the Plaza site, at approximately 8:20 a. m. on June 5, 1972. From there, he observed a group of about one hundred and fifty men push down the fence on the southwest border of the site. Mr. Hahn explained that a number of men would climb the fence until it began to bend from the weight upon it. As the fence curled backward, a trailing mass of men would trample it to the ground. These men, moving from one section of the fence to the next in this manner, progressed easterly towards Mr. Hahn as they destroyed the fence along the south border of the site. After they crushed the south fence, they turned north and began destroying the fence along the east border of the site.

8. The majority incorrectly states that the Commonwealth presented only "a photograph taken at the scene of the rioting which depicts Henry running along side of the fence which was being trampled down." The Commonwealth submitted at least four photographs which purportedly show Henry admidst a procession of rioters trampling the fence.

When they reached a point on the east fence across from Mr. Hahn, he photographed their actions. After they passed him, Mr. Hahn watched these men, responding to verbal commands, continue their mangled path northward along the east fence until they were out of sight. Mr. Hahn also testified that although many men picketed peacefully on North Gulf Road (old Route 363), which paralleled the west border of the site, and on First Avenue, which paralleled the south border, no picketing occurred along the east border of the site. In fact, no public thoroughfare paralleled the east border.

Another onlooker, Richard P. Sutton, corroborated Mr. Hahn's description of the manner in which the fence was destroyed. Most significantly, Mr. Sutton, who, like Mr. Hahn, observed the attack on the Plaza site from the SKF parking lot, described the destruction of the fence as one "continuous act" (NT 2209). He specifically denied defense counsel's suggestion that the fence was sporadically destroyed by men who occasionally separated from a mass of nearby picketers. Mr. Sutton further testified, as did Mr. Hahn, that no public thoroughfare existed along the east border and that the men moved in response to shouted commands.

It is, of course, a "[w]ell-settled proposition that the presumption of an accused's innocence in a criminal prosecution places upon the Commonwealth an unshifting burden to prove every element of the crime beyond a reasonable doubt." *Commonwealth v. Farrell*, 476 Pa. 128, 131, 381 A.2d 1258, 1260 (1977). The Commonwealth, however, is not required to prove guilt beyond all doubt. *Commonwealth v. Williams, supra.* Thus, ". . . circumstantial evidence, in itself, may be sufficient to establish the commission of a crime and the accused's connection therewith." *Commonwealth v. Simpson*, 436 Pa. 459, 463, 260 A.2d 751, 754 (1970). Where, however, ". . . a conviction is based entirely on circumstantial evidence, 'the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all.'" *Commonwealth v. Simpson, supra*, 436 Pa.

at 464, 260 A.2d at 754, *quoting Commonwealth v. Clinton,* 391 Pa. 212, 218, 137 A.2d 463, 466 (1958). Here, the Commonwealth's evidence places Henry, a member of the Roofers' Local, among many men working collectively to destroy the fence along the east border of the site. According to witnesses, these men progressed northward along the east border in response to verbal commands. Moreover, they trespassed on private property in an area far removed from where any peaceful picketers congregated. And, most significantly, the entire group of men moved as one to destroy the fence. After reviewing all of the Commonwealth's evidence against the appellant, I believe that the jury's verdicts properly derived from the evidence presented and were not founded upon conjecture. I would therefore affirm appellant's conviction of riot.

For the same reasons as stated for appellant Henry, I believe that the conviction of riot against appellant Reeves must stand. Reeves was also photographed by Mr. Hahn as being among those men who were destroying the fence along the east border of the construction site. The majority states that "[t]he pictures demonstrating [Reeves'] presence at the scene were taken after the destruction was complete and do not depict him as engaged in any act of violence or encouragement." The record rebuts this statement. While the Commonwealth did submit a number of photographs depicting Reeves among peaceful protesters along First Avenue after the site was destroyed, the Commonwealth also presented at least three photographs [9] taken by Mr. Hahn which showed Reeves among those who destroyed the east fence.

Conspiracy to do an unlawful act occurred under the Penal Code when: "Any two or more persons . . . falsely and maliciously conspire[d] and agreed to cheat and defraud any person of his moneys, goods, chattels, or other property, or do any other dishonest, malicious, or unlawful act to the

**9.** See the following Commonwealth exhibits: Number Eighteen (also Number Eighteen A), Number Nineteen (also Number Nineteen A), and Number Twenty-one (also Number Twenty-one A).

prejudice of another . . . ." Act of June 24, 1939, P.L. 872, § 302 (18 P.S. § 4302). The essence of every criminal conspiracy is a common understanding, no matter how it comes into being. *Commonwealth v. Yobbagy,* 410 Pa. 172, 188 A.2d 750 (1963), *Commonwealth v. Strantz,* 328 Pa. 33, 195 A. 75 (1937). Since the Commonwealth may sustain its burden to prove every essential element of a crime beyond a reasonable doubt by means of circumstantial evidence, *e. g., Commonwealth v. Long,* 470 Pa. 204, 368 A.2d 265 (1977), the Commonwealth is not required to prove directly a formal or explicit agreement to establish the existence of a conspiracy. "Although the evidence must show more than a mere association to establish the conspiracy, '[a] conspiracy may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts on the part of coconspirators have uniformly held competent to prove that a corrupt confederation has in fact been formed.'" *Commonwealth v. Minnich,* 236 Pa.Super. 285, 288, 344 A.2d 525, 526 (1975), *quoting Commonwealth v. Horvath,* 187 Pa.Super. 206, 211, 144 A.2d 489, 492 (1958). Here, the evidence which places both Henry and Reeves on private property with a number of men acting collectively and systematically to destroy the fence along the east border sufficiently demonstrates their confederacy with others to commit riot.

Under the Penal Code "[w]hoever maliciously or wantonly [broke] or [threw] down any post, rail or other fence erected for the enclosure of land, or [carried] away, [broke] or [destroyed] any post, rail or other material of which such fence was built, enclosing any lots or fields, [was] guilty of a misdemeanor . . . ." Act of June 24, 1939, P.L. 872, § 940 (18 P.S. § 4940). I believe that the photographs of the appellants and the testimony explaining the scenes depicted in those photographs clearly combine to establish that the appellants participated in the destruction of the east fence.

## II

The seven appellants contend that the trial judge abused his discretion by failing to grant their application for a

change of venue. The appellants predicated their application upon the belief that a fair and impartial jury could not be procured in Montgomery County because of pervasive pre-trial publicity prejudicial to them. I agree with the majority that no merit exists in the appellants' contention.

At the time of the proceedings in question, an application for a change of venue could be made by the defense counsel, the prosecution, or the court on its own motion, when it was determined after a hearing that a fair and impartial trial could not be obtained in the county in which the complaint was filed.[10] The grant or refusal of a request to change venue is within the sound discretion of the trial judge. *E. g., Commonwealth v. Frazier,* 471 Pa. 121, 369 A.2d 1224 (1977); *Commonwealth v. Hoss,* 469 Pa. 195, 364 A.2d 1335 (1976). "However, the exercise of this discretion must be examined in light of Art. 1, § 9 of the Pennsylvania Constitution which provides that persons accused of crime are entitled to 'a speedy public trial by an impartial jury of the vicinage.'" *Commonwealth v. Hoss, supra,* 469 Pa. at 199, 364 A.2d at 1337. Thus, "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Impartiality, however, " '. . . is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and

10. Pa.R.Crim.P. 313(a), provided that: "All applications for a change of venue shall be made to the court of the county in which the complaint was filed. Such application may be made on behalf of the defendant or the Commonwealth, or venue may be changed by the court, of its own motion, when it is determined after hearing that a fair and impartial trial cannot be had in the county in which the complaint was filed. An order changing venue shall be certified forthwith to the Supreme Court and either the defendant or the Commonwealth may appeal to the Supreme Court within ten days from the date of such order. Such appeal shall operate as a supersedeas until disposition of the appeal. If no appeal is taken, or upon dismissal of an appeal, the Supreme Court shall designate the county of transfer." Pa.R.Crim.P. 313 was amended and renumbered, effective January 1, 1978, by an order of the Pennsylvania Supreme Court promulgated on June 29, 1977.

artificial formula.' " *Commonwealth v. Harkins,* 459 Pa. 196, 199, 328 A.2d 156, 157 (1974), *quoting United States v. Wood,* 299 U.S. 123, 145–146, 57 S.Ct. 177, 81 L.Ed. 78 (1936). For this reason, ". . . appellate tribunals have the duty to make an independent evaluation of the circumstances" of each case to determine if an accused's right to a fair trial was protected despite prejudicial publicity either before or during trial. *Sheppard v. Maxwell, supra,* 384 U.S. at 362.

Although each case must be evaluated on its own merits, appellate courts have formulated several broad propositions to help determine the impact of prejudicial publicity. First, although "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print," *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), prospective jurors need not be free of all knowledge of the facts and circumstances surrounding the event which forms the basis of the trial. As the United States Supreme Court has stated:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

Second, if a juror has been exposed to prejudicial publicity, then an accused may demonstrate ". . . the actual

existence of such an opinion in the mind of the juror as will raise the presumption of partiality . . . ," despite the juror's assurances of impartiality. *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. 1639.[11] Finally, even if an accused cannot demonstrate actual jury prejudice due to publicity, then such prejudice may be presumed if the denial of due process is *"inherent in the publicity."* (emphasis in original) *Commonwealth v. Frazier,* 471 Pa. 121, 124, 369 A.2d 1224, 1227 (1977); *see also Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell, supra; Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). Prejudice has been presumed in two distinct situations.

"First, where the pretrial media coverage is so extensive, so sustained, so pervasive and includes highly inflammatory and prejudicial information (rather than a factual account of the events reported) courts have determined that prejudice may be presumed. (citations omitted) The other instance where courts have presumed the existence of prejudice has been where it was determined that in addition to inflammatory pretrial publicity, the dignity and the objectivity of the court proceedings themselves have been disrupted by the publicity. (citations omitted)." *Commonwealth v. Hoss, supra* 469 Pa. at 201–02, 364 A.2d at 1338.

The instant case does not fall within either category. In support of their motion for a change of venue, the appellants presented the trial judge with approximately one hundred newspaper articles concerning the case. Although the appellants admit that none of these articles contained any

11. In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), where prejudicial publicity led eight out of twelve jurors to believe prior to trial that the defendant was guilty of the crime charged, the Supreme Court stated: "With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. . . . No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Id.,* 366 U.S. at 727–28, 81 S.Ct. at 1645.

inflammatory reference to them individually, they contend that they were "tried and convicted in the press by means of guilt by association" because they were members of the Roofers' Union, Local 30, which had been "pilloried" by reporters, who "deplored the June 5 incident." The articles, however, despite the appellants' assertions to the contrary, were largely factual in nature. Nevertheless, even if it is assumed, *arguendo,* that the articles were prejudicial to the appellants, it is clear that the articles were not so sustained ". . . as to justify the conclusion that the community had been saturated with inflammatory information and thus was necessarily incapable of providing individuals who could render a fair and impartial verdict." *Commonwealth v. Hoss, supra,* 469 Pa. at 202, 364 A.2d at 1339.[12] Most of the articles were published shortly after the incident occurred, approximately nineteen months prior to the commencement of trial. Furthermore, even though a few articles were published when the trial proceedings commenced, the appellants failed to accept the trial judge's offer to continue the case, which would have provided further time for any inflammatory effect of the reports to cool.[13] Under such circumstances, prejudice cannot be presumed on the basis of impermissibly extensive pretrial publicity. Moreover, the appellants do not assert that the proceedings were "lacking in the solemnity and sobriety" to which they were entitled. *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Therefore, since prejudice cannot be presumed in the instant case, the appellants must base their claim upon a showing of "identifiable prejudice as a result of

12. In denying appellants' request for a change of venue, the trial judge reviewed the nature of the publicity and the size of the community from which the jury was to be chosen and concluded that: "[I]n this county, with the population that we have, . . . we can secure a jury which will fairly try this case through the use of individual voir dire. If it turns out we cannot, at that time, . . ., we can take appropriate measures then."

13. Although appellants do not waive their request for a change of venue because of their failure to use an available remedy to reduce publicity, *see Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975), such failure will weigh against their request. *See Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974).

pretrial publicity." *Commonwealth v. Hoss, supra,* 469 Pa. at 202, 364 A.2d at 1339. To determine whether such a showing has been made, an appellate court must review those factors which may signify that identifiable prejudice had occurred.

One factor to be considered in ascertaining the impact of pretrial publicity is the efforts of the trial judge to abate the publicity. As previously mentioned, the trial judge offered to continue the case. This offer was refused by the appellants. Furthermore, the trial judge employed individual voir dire in selecting the jury. The prospective jurors were extensively questioned about their familiarity with the publicity arising from the case and about their ability to decide the case exclusively from the evidence presented in court. During the selection, the trial judge not only granted the appellants an additional number of peremptory challenges, but also liberally granted challenges for cause. Although the jury selection process was lengthy,[14] the appellants failed to exercise all of their peremptory challenges. As the Pennsylvania Supreme Court stated in *Commonwealth v. Hoss, supra* : "It is difficult to understand how a party can object to the acceptance of a juror where that party possessed preemptory [sic] challenges and failed to exercise them." *Id.,* 469 Pa. at 204, 364 A.2d at 1339–40. The appellants failed to show any partiality on the part of any juror. In addition to exercising careful jury selection procedures, the trial judge sequestered all witnesses during the course of the trial, enjoined public comment upon the case by opposing counsel, and liberally cautioned the jurors against exposing themselves to publicity about the case.

Another factor to be considered in determining the impact of pretrial publicity upon the jury is the length of time between the publicity and the commencement of trial. *E. g., Commonwealth v. Hoss, supra; Commonwealth v. Nahodil,* 462 Pa. 301, 341 A.2d 91 (1975). As previously stated, the great majority of the reports concerning the incident were published immediately after the riot occurred. In fact,

14. The selection process was accomplished in twelve days.

the appellants produced only two articles published within five months of the trial. Although these articles were primarily factual in nature, the trial judge offered to continue the case. Since this offer was refused by the appellants, any possible prejudicial effect of those articles must be discounted. In *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), the Pennsylvania Supreme Court held that a delay of six months between the publicity and the trial "was [sufficient] time for the effect of these news articles to fade from the minds of prospective jurors." *Id.,* 468 Pa. at 276, 361 A.2d at 288, *quoting Commonwealth v. Powell,* 459 Pa. 253, 260, 328 A.2d 507, 511 (1974). *See also Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971) (where a period of five months passed between the publicity and the trial).

Another factor to be considered is the nature of the community from which the jury is to be selected. Massive publicity about an incident will logically render it more difficult to procure an impartial jury from a small, closely-knit community than from a larger, more cosmopolitan community.[15] Here, trial occurred in Montgomery County, which is a large, urban-oriented community populated by over 623,000 people. Moreover, as previously stated, news coverage of the incident stopped almost entirely for a five month period prior to trial. Under such circumstances, it can not be concluded that the appellants were unable to obtain a panel of impartial jurors from the community. In fact, evidence of juror impartiality is shown by the fact that the jury selection process was completed without the appellants exhausting the number of peremptory challenges allotted. *Commonwealth v. Hoss, supra.*

Perhaps the most significant factor in determining the impact of publicity upon the instant jurors is the verdicts rendered by them. The appellants contend that they were convicted only because they were members of the Roofers'

15. Compare *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (where trial occurred in a rural county with a population of approximately 30,000 people) with *Commonwealth v. Hoss,* 469 Pa. 195, 364 A.2d 1335 (1976) (where trial occurred in urban Allegheny County which has a population of over 1,600,000 people).

Union which had been accused in news reports as being responsible for the destruction of the site. This theory of "guilt by association" is undermined, however, by the fact that Donald Offner and Clinton Holmes, both members of the Roofers' Union,[16] were acquitted of all charges by the instant jury.

For all of the above-stated reasons, I agree with the majority that the lower court did not abuse its discretion by refusing to grant the appellants' request for a change of venue.

## III

The appellants next contend that the trial judge failed to take adequate measures to prevent prejudicial publicity from reaching the jurors during trial. Specifically, the appellants contend that the trial judge erred by not sequestering the jury or, absent sequestration, by failing to inquire of the jurors a sufficient number of times whether or not they had become cognizant of any news reports concerning the case and, if so, whether or not such reports had affected their impartiality. The majority agrees with the appellants' contentions and orders a new trial. I believe, however, that the precautionary measures taken by the trial judge adequately preserved the appellants' right to an impartial jury.

Although the minimal standards of constitutional due process guarantee an accused a fair trial by a panel of impartial jurors, e. g., Commonwealth v. Stewart, 449 Pa. 50, 295 A.2d 303 (1972), cert. denied, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974), "[t]he procedure to be followed to ensure a fair trial in the face of prejudicial publicity is clearly within the sound discretion of the trial court." Commonwealth v. Bruno, 466 Pa. 245, 261, 352 A.2d 40, 48 (1976), cf. Margoles v. United States, 407 F.2d 727 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). The decision of the trial court will not be reversed absent an

---

**16.** Although both parties agree that both Offner and Holmes were members of the Roofers' Union, the trial judge states in his opinion that only one of the men was a union member.

abuse of discretion which prejudices the accused. *See Commonwealth v. Bruno, supra.*

Since they produce no direct evidence of jury prejudice, the appellants claim that the publicity which occurred during trial was of such a nature that prejudice should be presumed. In certain situations, as previously stated, jury prejudice has been presumed because the denial of due process was *"inherent in the publicity."* (emphasis in original) *Commonwealth v. Frazier, supra,* 471 Pa. at 124, 369 A.2d at 1227. *See, e. g., Commonwealth v. Pierce, supra; Commonwealth v. Stewart, supra.* However, as the Pennsylvania Supreme Court stated in *Commonwealth v. Bruno, supra* : "Our cases also make clear that the trial court can avoid this presumption of prejudice by taking careful precautionary measures." *Id.,* 466 Pa. at 266, 352 A.2d at 51.[17] In fact, "[w]hen there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action. Although the proper precautions are inevitably dictated by the circumstances of each case, they must reasonably ensure that no prejudice will occur. *"Commonwealth v. Bruno, supra,* 466 Pa. 266, 352 A.2d at 51.

In addition to various pretrial remedies,[18] the trial judge may also employ numerous procedures during trial to ensure

17. As the supreme court explained in *Commonwealth v. Bruno,* 446 Pa. 245, 352 A.2d 40 (1976): "[I]n *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975), the jury was drawn from the same panel as the jury in a previous trial of the same defendant. The same situation occurred in *Commonwealth v. Free,* 214 Pa.Super. 492, 259 A.2d 195 (1969), and a new trial was ordered because of the possibility of prejudice. This Court, in *Dukes,* distinguished *Free* because 'the trial court was meticulously careful to ascertain that no member of the jury was aware of the previous trial. Each juror was questioned in private, and an extensive voir dire examination was allowed. We held: 'We are satisfied that the careful precautionary measures taken by the trial judge adequately served to insure the selection of a fair and impartial jury, one untainted by any knowledge that Dukes had been charged with another crime. There was thus no probability of any prejudice to appellant.' *Commonwealth v. Dukes, supra,* 460 Pa. at 185, 331 A.2d at 481." *Id.,* 446 Pa. at 266, 352 A.2d at 51.

18. As previously indicated, these remedies include careful jury selection procedures, change of venue, or a continuance.

that an accused is not prejudiced by adverse publicity. For example, Pa.R.Crim.P. 326 provides that in a widely publicized or sensational case, the trial judge may issue a special order restricting extra-judicial statements by parties and witnesses when such statements would be likely to interfere with the rights of the accused to a fair trial by an impartial jury.[19] *See also* Pa.R.Crim.P. 323(g) (impoundment of suppression hearing record); *Commonwealth v. Bruno, supra*, 466 Pa. at 461–62, 352 A.2d at 49. The trial judge may also sequester jurors as they are accepted and until they are discharged. Pa.R.Crim.P. 1111.[20] In a highly reported case, the trial judge, however, on his own or at counsel's request, should caution prospective jurors during jury selection, and the trial jurors during the trial, not to read, listen to, or view any news reports concerning the case. *See, e. g., Commonwealth v. Bruno, supra.* Furthermore, if it appears that, despite any procedures employed to prevent prejudicial publicity from reaching the jurors, one or more jurors has read, heard, or seen any prejudicial matter concerning the case, the trial judge, upon request, must question the jurors about their contact with such matter. *Commonwealth v. Bruno, supra.*

Appellants' trial began on January 21, 1974, and lasted until April 13, 1974. Prior to trial, however, the trial judge

**19.** Specifically, Pa.R.Crim.P. 326 states that: "In a widely-publicized or sensational case, the Court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, the seating and conduct in the courtroom of spectators and news media representatives, the management and sequestration of jurors and witnesses, and any other matters which the court may deem appropriate for inclusion in such an order. In such cases it may be appropriate for the court to consult with representatives of the news media concerning the issuance of such a special order."

**20.** Pa.R.Crim.P. 1111 provides that: "(a) The trial judge may, in his discretion, order sequestration of trial jurors in the interests of justice. (b) When sequestration is ordered, each juror, including any alternate, shall be sequestered from the time of acceptance as a juror until· discharge. (c) Nothing in subsection (b) shall prevent a trial judge from ordering sequestration, or vacating his order of sequestration, at any time during a trial when the interests of justice require."

cautioned each juror, as he was selected, not to speak to anyone concerning the case and not to read, listen to, or watch any news report which might concern the case.[21] The lower court also sequestered all witnesses and enjoined public comment on the case by opposing counsel. The appellants contend that the trial judge erred by not sequestering the jurors or, absent sequestration, by not inquiring of the jurors more often, and individually, whether or not they had come into contact with news reports concerning the case.

As previously stated, the trial judge is granted broad discretion in determining whether to sequester the jurors. Pa.R.Crim.P. 1111; *see Commonwealth v. Bruno, supra.* "Although [sequestration of jurors] insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 564, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976). However, because sequestration may engender resentment on the part of jurors and may not always facilitate calm deliberations, sequestration should not normally be ordered sua sponte. *See Margoles v. United States, supra; Sheppard v. Maxwell, supra* (sequestration should have been raised sua sponte because of unusual circumstances).

Similarly, the giving of cautionary instructions to the jury and the manner of interrogating the jury about their possible exposure to prejudicial material is within the sound discretion of the trial judge. *Commonwealth v. Bruno, supra; see also* ABA Project on Minimum Standards for Criminal Justice Standards Relating to Fair Trial and Free

21. The voir dire of the prospective jurors was apparently either not recorded or transcribed. See Pa.R.Crim.P. 1106(c). The lower court states in his opinion that the jurors were given proper cautionary instructions as each was chosen. The appellants do not contend that these instructions were not given, but rather that the instructions were not given frequently enough.

Press, § 3.5(e) (Tent. Draft, 1968).[22] As the Pennsylvania Supreme Court explained in *Commonwealth v. Bruno, supra,* 466 Pa. at 267–68, 352 A.2d at 52: "The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of other jurors. *See United States v. Schrimser,* 493 F.2d 848, 854 (5th Cir. 1974); *Mares v. United States,* 383 F.2d 805, 809 (10th Cir. 1967); *Margoles v. United States, supra* at 737; ABA Standards Relating to Fair Trial and Free Press §§ 3.5(e), (f) (Commentary) (footnote omitted). However, questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case. *See, e. g., United States v. Schrimser, supra; Margoles v. United States, supra.*"

In the instant case, on January 21, 1974, the first day of trial, the trial judge reiterated the precautionary instructions which he had given each juror after voir dire. The trial judge stated:

"In the meantime, you will recall my instructions to you just before you left the stand here when you were voir dired and has also been mentioned by counsel. You *must* avoid talking about the case with anyone; you *must* avoid reading about it; try to keep your minds just as clear as they can be so that you can do justice in this case on the basis of the evidence that you will hear in the courtroom and that alone." (emphasis added)

On the next day of trial, January 22, all three defense counsels related to the court that a local Philadelphia paper had reported a statement made by the District Attorney from Camden County, New Jersey, which linked the Roofers' Union, Local 30, to the Mafia. The appellants' attorneys, claiming prejudice to their clients on the basis of this article, asked the trial judge either to grant a mistrial or to

22. These standards recommend that: "If the process of selecting a jury is a lengthy one, [precautionary instructions] shall also be given to each juror as he is selected. At the end of each subsequent day of the trial, and at other recess periods if the court deems necessary, an admonition . . . shall be given."

interrogate the jury to ascertain whether any members had read the article. The trial judge refused to grant a mistrial. The attorneys for the appellants then bickered among themselves as to whether the trial judge should specifically question the jurors whether they had read the article in question or whether he should generally question the jurors whether they had read anything at all. The trial judge finally stated: "I will ask in the most general way that I can think of whether there has been any reading of the articles concerning the case or Roofers' Union 30." No attorney objected to the proposed questioning nor did any attorney request that the jury be questioned individually. The trial judge therefore asked the jurors:

"[W]hether any of you have read any articles concerning this case or concerning Roofers' Union 30 or concerning the Altemose Construction Company or J. Leon Altemose. If any of you have read anything concerning this case or either of the two entities that I just mentioned, would you simply raise your hand and we will take it from there."

In response, juror Number 14 raised her hand, stating: "Yes, I just read the account of my selection for the jury." Upon further specific inquiry by the trial judge, this juror emphasized that she had read nothing else about the case. No other member of the jury responded to the trial judge's questioning.

The majority concludes that the trial judge erred by not conducting a more specific inquiry of each individual juror. The majority totally neglects to consider that no defense attorney requested either that the jurors be questioned more specifically or that each juror be questioned individually. The absence of such requests must weigh heavily against a conclusion that the trial judge abused his discretion. The majority further faults the trial judge for failing to instruct the jurors not to read, listen to, or watch any reports concerning the case when they were dismissed on January 22. The majority overlooks that the trial judge had already cautioned the jurors in this regard earlier in the day:

"Members of the jury, this has been said to you so many times that I almost hesitate to raise it again. But, you will recall that you were all cautioned that you must be careful not to contaminate your mind, so to speak, with reading any comment about this case or any collateral issues to this case and keep your minds free and clear." (NT 1446a).

The trial judge frequently cautioned the jury to avoid publicity concerning the case. For example, the trial judge cautioned the jury on January 29. On January 31, he repeated those instructions. On January 31, however, the defense requested *for the first time* that the jury be sequestered. The defendants' request arose from fear that prejudicial publicity might result from the appearance that day in court of an alleged identification witness, Culvert Quitman.[23] Mr. Quitman, who had driven protesters to the riot site in a bus, had testified at a preliminary hearing, but had failed to appear at the pretrial suppression hearing. The Commonwealth requested that the suppression hearing be reopened to allow Mr. Quitman to testify. The trial judge denied the motion to sequester the jury and then, outside the presence of the jury, allowed the Commonwealth to present evidence to prove that Quitman was truly unavailable at the time of the previous suppression hearing.

**23.** Mr. Peruto, one of the defense attorneys, explained that: "And specifically with regard to Quitman in particular, the radio has been saying over and over that the Commonwealth has produced a series of witnesses, none of whom could identify any of the Defendants. And the broadcasts seem to point—they question Mr. Nicholas [assistant district attorney] about what's happening, when is somebody going to be identified. And they quote Mr. Nicholas as saying—and I don't mean to say Mr. Nicholas made this quote, I'm just pointing to the prejudicial effect of the broadcast itself—but they quote Mr. Nicholas as saying that it was necessary to proceed in this fashion, but that it's a two-phased prosecution and that this phase that they are now entering will be the phase where there will be positive identification. Now the point is that the press has been repeating the story of no identification over and over, to where they have built it to the point where there will be almost certainly explosive prejudicial publicity when they finally get to an identification witness such as Quitman."

On the morning of February 4, defense counsel relayed to the court that news stations had been repeatedly broadcasting that the trial judge was about to rule on whether or not a "surprise witness" would be allowed to testify and identify one of the defendants. As one defense counsel stated to the court:

"[T]he import of [these broadcasts] was clearly that there is an identification witness, his name is Quitman, and gave the impression that the jury had been recessed for two days for defense to attempt to keep his testimony out of the case."

Defense counsel further commented:

"As has been announced by Stanford Shmukler, the attorney for Mr. Quitman, it's his intention to plead the Fifth Amendment, that we will be getting further broadcasts of similar nature, I am afraid, and then the defendants will be prejudiced no matter which way it goes."

After this information was given to the court, the defense attorneys again disagreed among themselves as to what action the lower court should take. Mr. Moore and Mr. Simone [two defense attorneys] requested that the trial judge grant a mistrial because the jury had not been sequestered earlier. Mr. Peruto refused to join in this motion, requesting instead that the trial judge interrogate the jurors as to whether they had come into contact with any publicity. Mr. Simone disagreed with this request. Mr. Moore, on the other hand, agreed that the jury should be questioned but only in a very general manner.

The trial court denied the motion to sequester the jury, stating that:

"I should say right now when we discussed this matter at the very inception of this case many months ago we visualized the possibility that some publicity was going to come out of this case and there was no motion to sequester.

The jury has been empaneled without any interrogation whatsoever concerning what this would do to them, whether they could properly serve with their sequestra-

tion. I do not see where I can sequester without suggesting it at one point of the voir dire, going through voir dire with all fourteen. I do not consider the situation of that magnitude, so that motion is denied."

The trial judge also denied the appellants' request to interrogate the jurors.

The trial judge explained:

"The request for some sort of interrogation of the jury is also denied at this moment because it's not my intention to make any ruling in open court . . . concerning Quitman, but tonight it will be apparent something is afoot because I will exclude the press. We will have to see what if anything develops in the way of news in that regard. It would be my intention tomorrow morning to question the jury as to whether they read anything about the case."

After this, the jury reconvened and trial proceeded. Later that day, after the jury had been excused,[24] the trial judge heard testimony from Mr. Quitman concerning the exercise of his right to remain silent. At the end of the hearing, the trial judge cautioned "everyone within hearing that the

24. The majority states that: "[T]he court again failed to give proper cautionary instructions to the jury when it was excused for the duration of the Quitman inquiry." This statement is misleading because the "duration of the Quitman inquiry" could refer to either of two distinct periods of time. The first period began on January 31, when the trial judge dismissed the jury so that he could investigate the Commonwealth's claim that Quitman was unavailable to testify at the earlier suppression hearings. The jury did not reconvene until February 4. Prior to dismissing the jury on January 31, however, the trial judge extensively cautioned the jury to avoid any publicity concerning the case. Since the jury was cautioned on this occasion, the majority must be directing itself to the afternoon of February 4, when Mr. Quitman exercised his right to remain silent. There, however, the trial judge had delayed Mr. Quitman's testimony until after the jury was excused at the end of the day. The jury again reconvened the next morning. Although the jury was not cautioned to avoid all publicity about the case when it was excused on February 4, the trial judge did employ several remedies to prevent prejudicial publicity concerning Quitman's decision to assert his right to remain silent. First, he closed the hearing to the public, and second, he enjoined all public comment by those present at the hearing.

purpose of keeping this hearing closed was to prevent any prejudice in this case. I will therefore instruct all persons not to tell what occurred here to anyone else outside the courtroom."

Unfortunately, two days later, on February 6, 1974, Mr. Peruto informed the trial judge that radio broadcasts have been "blaring intermittently . . . constantly referring to the Quitman testimony and the plea of the Fifth Amendment and the refusal to testify . . . ." Mr. Moore also entered into evidence an article from a local newspaper, dated February 5, encaptioned:

"Bus Driver Pleads Fifth—

State's Key Witness Refuses to Testify."

The text of the story indicated that the prosecution was "undercut" by the refusal of Mr. Quitman to testify against Joseph Ford, one of the nine defendants. The defendants asked that a mistrial be granted or that the jury be sequestered. The trial judge denied the motion for mistrial, but commented that he would reconsider it if any juror, upon questioning, should indicate that he had become aware of prejudicial publicity. The following colloquy then occurred:

"MR. PERUTO: Concerning that inquiry, your Honor, is it your intention to question the jury en masse or individually?

THE COURT: En masse.

MR. PERUTO: Then, your Honor, I request that you only ask them to raise their hands if they are aware of any story that was printed concerning things that they had not heard when they were in recess, but not to go into it because we may contaminate those that may not have

. . .

THE COURT: The last thing I would do would be to be specific in this.

MR. MOORE: My suggestion or my request, if one juror indicates they read about it, I would ask your Honor to individually voir dire that juror and excuse the rest of the jurors at that time so the other jurors will not hear the answers of the other person.

458

THE COURT: Absolutely."

The trial judge then questioned the jury whether they had read or heard anything concerning the case. The jury responded negatively, and trial proceeded. The defendants offered no objection to the manner in which the jury was questioned.

The defendants next alleged the publication of prejudicial material on February 18, 1974, when one defense counsel stated to the court:

> "Your Honor, on Friday morning I was aware of a newspaper article that appeared in the Philadelphia Inquirer on Thursday night, Friday Morning, which I will get a copy of and make an exhibit, which indirectly spoke of this trial. But directly, the headline was that the union roofers beat up non-union roofers over in Jersey, in Camden. And then it went on to say that the members of Local 30 are on trial for the same type of activity."

The lower court then inquired of the jury whether they had read anything about the case "or anything collateral to the case . . . ." The jurors all responded that they had not.

On March 14, trial was delayed because of a bomb threat. The next day, a newspaper headline read: "Telephone Scare halts Altemose Labor Trial." [25] After questioning by the trial judge, the jury again indicated that they had avoided all publicity about the case.

As previously stated, Pa.R.Crim.P. 1111 provides that the trial judge may sequester the jury at any time during trial "when the interests of justice require." [26] Thus, the grant or

25. The last two paragraphs of this article read: "After the bomb scare defense attorney Cecil B. Moore worried aloud that the jurors in the case would blame the bomb threat disruption on the nine defendants. J. Leon Altemose, President of the construction company, 'is the only one who benefits because he knows he's blowing this case'; Moore angrily charged." Mr. Moore admitted making the comment, which was in direct violation of the trial judge's order that the parties involved in the case were not to make public their opinions of the case. The trial judge was certainly correct in admonishing Mr. Moore for his conduct, which was truly, as the trial judge described, "reprehensible."

26. See n. 20, *infra*.

denial of a motion to sequester the jury is within the sound discretion of the trial judge. I do not believe that the instant record reveals that the trial judge abused his discretion by refusing to sequester the jury.

Prior to trial, the defendants knew that their case would engender publicity, yet they did not request that the jury be sequestered. Indeed, they did not even suggest that prospective jurors be questioned as to whether they would be able to function impartially if sequestered. This failure on the part of the defendants indicates not only that the environment surrounding the trial was not so charged as now claimed, but also that the defendants were primarily responsible for the dilemma which confronted the lower court at trial. As every criminal attorney knows, a possibility of jury resentment accompanies any order of sequestration. Here, however, the trial judge faced a situation in which jury resentment upon sequestration was probable, not merely possible, because the jurors had not been forewarned that they might be sequestered.[27] Thus, if the jurors were not sequestered, prejudice could result to the defendants from the publicity surrounding the trial. If, on the other hand, the jurors were sequestered, prejudice could result to the defendants from the wrath of an aggravated jury.

27. In fact, during the trial, Mr. Peruto had once argued against sequestering the jury for precisely that reason. As Mr. Peruto explained:

"It appears to me, Your Honor, that when this jury was voir dired, they were not told that they were to be sequestered. And some of them, if my recollection serves me properly, indicated in response to Your Honor's question with regard to hardship in serving on the jury, that they could handle the matters which they would otherwise have handled during the time that they would have off. I think Your Honor even went so far as to tell them what the proposed schedule would be of recesses and the convening of court, so that they could handle those matters.

To now suggest a sequestration of this jury I think would be prejudicial to my clients in that this jury may very well become so disgusted and angered by it that they may demonstrate an impatience in their deliberations with that which does go forward; that they may rush their deliberations and penalize, as it were, the defendants for having been sequestered."

The trial judge did not abuse his discretionary power by refusing to sequester the jury. He carefully balanced the prejudicial impact of the publicity surrounding the trial against the adverse effect of jury resentment. Although he determined that the granting of the motion to sequester the jury would be more deleterious to the defendants than the denial of that motion, he cautiously tempered his refusal to sequester the jury by employing several other procedures intended to alleviate the effect of prejudicial publicity. For example, he sequestered the witnesses during trial; he enjoined public comment by the parties; he closed the Quitman hearings to the public; he frequently cautioned the jurors that they were obliged to avoid publicity about the case; and most significantly he often questioned the jurors concerning possible contact with publicity. Although not denied the opportunity by the trial judge, the defendants failed to demonstrate identifiable jury prejudice arising from the refusal of the trial judge to sequester the jury.

Similarly, the appellants failed to demonstrate the validity of their claim that they were prejudiced by the trial judge's refusal to caution the jurors to avoid all publicity about the case on a daily basis. The frequency of cautionary instructions is within the discretion of the trial judge. The record shows that the trial judge frequently reminded the jurors of their duty not to read, listen to, or watch any news reports concerning the case. Most importantly, despite frequent questioning in this regard, no juror ever indicated that he had become aware of any prejudicial publicity. Moreover, the appellants can not now claim that the trial judge erred by not interrogating the jury individually and more specifically concerning any contact with prejudicial material because the appellants never requested that the trial judge question the jury in such a manner.

It is true that prejudice will be presumed in certain cases because " . . . our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Although I believe that the trial judge avoided any

arguable presumption of prejudice by employing careful precautionary measures, *compare Commonwealth v. Bruno, supra,* perhaps the best indication of jury impartiality lies in a fact not mentioned by the majority, that is, the acquittal of two of the appellants' co-defendants.

## IV

The appellants next contend that certain statements of the assistant district attorney during his closing argument to the jury transgressed the bounds of professional propriety and deprived them of a fair trial. I find no merit in this contention.

Three of the eleven alleged prejudicial statements may not be considered on appeal because the appellants did not object to them during trial. *E. g., Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977); *Commonwealth v. Davenport,* 462 Pa. 543, 342 A.2d 67 (1975). The Commonwealth, however, contends that two other statements may not be reviewed because the appellants did not object to them during the closing argument. Although it is true that the appellants did not object to those two statements during the closing argument, the appellants did question the propriety of those statements in time for the trial judge to correct their alleged prejudicial effect. Since the prosecutor's summation was recorded and its contents were not disputed, the appellants' objection to the two statements was timely. *Commonwealth v. Gilman, supra; Commonwealth v. Adkins,* 468 Pa. 465, 364 A.2d 287 (1976).

Before examining the alleged prejudicial remarks, we reiterate: "[T]he prosecutor is a quasi-judicial officer representing the Commonwealth. His duty is to seek justice, not just convictions. *E. g., Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975); *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972)." *Commonwealth v. Gilman, supra,* 470 Pa. at 188, 368 A.2d at 257. During his closing argument, the prosecutor must ". . . present the facts so that the jury can dispassionately and objectively evaluate the testimony in a sober and reflective frame of mind that

will produce judgment warranted by the evidence and not inspired by emotion or passion." *Commonwealth v. Harvell*, 458 Pa. 406, 411, 327 A.2d 27, 30 (1974).[28]

Improper remarks by a prosecutor, however, do not always necessitate a new trial. The language used by the prosecutor must be such that its " 'unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.' " *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975), *quoting Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). Moreover, "[t]he effect of such remarks depends upon the atmosphere of the trial, (citations omitted), and the proper action to be taken is within the discretion of the trial court." *Commonwealth v. Stoltzfus, supra,* 462 Pa. at 61, 337 A.2d at 882.

The appellants object to the following statement:

"Well, what about the precious right, the precious right to enjoy your property without fear that it is going to be destroyed by an angry mob? What about that right? Not a word about that right. Mr. Altemose has that right. Mr. Volpe had that right. And apparently there was no particular group against Volpe, but as happens when mobs take over innocent people—

**28.** See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, the Prosecution Function, § 5.8 (Approved Draft, 1971), which provides:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict."

When mobs take over innocent people get hurt. Innocent people like Volpe, innocent people like Ingoldsby, not that he was seriously injured, but, my God, the situation out there was just fraught with danger."

The appellants contend that the prosecutor interjected his personal belief in their guilt by using the term "mob". In *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974), the Pennsylvania Supreme Court granted the appellant and his alleged associates a new trial because they had been referred to as "hoodlums" and "animals" by the prosecutor. The court stated:

" 'It is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant. He has a right to *argue* that the *evidence* proves the defendant guilty as charged in the indictment but for *the district attorney himself to characterize* the defendant as 'a cold-blooded killer' is something quite different.' " (emphasis in original) *Commonwealth v. Lipscomb, supra*, 455 Pa. at 528, 317 A.2d at 207, *quoting Commonwealth v. Capalla*, 322 Pa. 200, 204, 185 A. 203, 205 (1936).

Although the prosecutor may not express his personal opinion regarding a defendant's guilt by unsavory characterizations of the defendant, he may refer to matters in evidence and the fair deductions and logical inferences therefrom. *E. g., Commonwealth v. Bolden*, 227 Pa.Super. 458, 323 A.2d 797 (1974). Here, the epithet "mob" attached not to the appellants but to that group of people which destroyed the Plaza site. The use of the word "mob" to describe rioters in a riot prosecution is not improper. *Commonwealth v. Kahn*, 116 Pa.Super. 28, 176 A. 242 (1935).

For similar reasons, the following statement by the prosecution was not improper:

"And then we come to Mr. Marino. I think one of the lowest points in this case, quite frankly. I could scarcely begin to gauge the depth of the animosity for Mr. Marino until these closing speeches. The absolute dislike, hatred. To what end? To attempt to destroy that young man because he was working for Mr. Altemose in an attempt to bring criminals to justice? Do not . . . ..

MR. SIMONE: Objected to, Your Honor, and ask for a mistrial.

MR. MOORE: Characterization, again.

MR. PERUTO: I join in that.

MR. MOORE: To the criminals characterization?

THE COURT: The reference was made, I presume, to persons responsible?

[DISTRICT ATTORNEY]: Persons responsible for the destruction, sir, I will amend it.

THE COURT: And not characterizating [sic] these defendants.

[DISTRICT ATTORNEY]: Yes, sir.

THE COURT: With that understanding the objection is overruled."

Here, again, the prosecutor's characterization referred not to the individual appellants but rather to those who participated in the riot. The appellants themselves admitted in court that a riot occurred. Moreover, the meaning of the prosecutor was made clear to the jury by the questions asked by the trial judge.

Appellants also complain of the following remark of the prosecutor:

"And then they proceeded with this scene in which the Court was asked [by defense counsel] to direct Mr. Marino to furnish the name [of an informant] and Mr. Marino refused, and I think that tells us something, Mr. Marino, not wishing to be intentionally contumacious of the Court, saw his responsibility to refuse to indulge that name, I submit to you, because he feared for the safety of that individual. Again, the violence in these photographs, the violence that you have heard discussed I think justifies that apprehension; and after some—

The appellants objected to this statement on the basis that the prosecutor "intimate[d] that these defendants would be likely to take the life of a person without any foundation of

evidence here—" At a side-bar conference, the trial judge sustained the appellants' objection and admonished the prosecutor to refrain from "any further comment along that line." The trial judge in his opinion explained that the prosecutor's remark, "[h]ad not the interruption occurred, may have been an impermissible inference from the evidence. An individual capable of doing property damage may not necessarily be capable of injuring some one's person." I believe that the prosecutor's remark was not improper at all. The evidence showed that rioters not only destroyed property at the Plaza site, but also hurled stones at two security guards and a policeman. Certainly, the failure of the rioters to injure these men can be attributed only to errant throwing ability and not the absence of malicious intent. The rioters also assaulted another policeman who attempted to restrain the stonethrowers. The conclusion is inescapable that those men who participated in the Plaza site riot would not hesitate to harm any individual who might stand against them. Furthermore, the prosecutor's remark did not refer directly to the defendants. Mr. Marino testified on several occasions that his unnamed informant produced no evidence against the defendants. In any event, the trial judge prevented any arguable prejudice to the defendants by sustaining the defendants' objection and cautioning the prosecution to refrain from similar comment.

The appellants next contend that the prosecutor erred by stating:

"Now, getting back to Altemose. The Commonwealth did not call him. That's right. And you saw throughout the course of this trial repeated efforts to smoke him out. That's the only word I can use for it. They wanted to get Mr. Altemose here.

And let me say, Members of the Jury, that Mr. Altemose had nothing to add to this case by way of proving any of the elements of the crimes charged. Not one—"

Although Mr. Altemose's appearance was not necessary for the Commonwealth to prove most of the charges against the

defendants, his failure to appear did cause the trial judge to direct a verdict in favor of two defendants on the charge of firing personal property.[29] I do not believe that this isolable error on the part of the prosecutor was such that its " 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.' " *Commonwealth v. Stoltzfus, supra,* 462 Pa. at 61, 337 A.2d at 882, *quoting Commonwealth v. Simon, supra,* 432 Pa. at 394, 248 A.2d at 292. Moreover, in his charge to the jury, the trial judge complied with defense counsel's request "that the jury be instructed so they are not left with that impression that has been falsely given . . . ."[30]

**29.** Both the appellants and the trial judge state that the failure of the Commonwealth to call Mr. Altemose as a witness resulted in the sustaining of a demurrer. Neither the appellants in their brief nor the trial judge in his opinion gives a page reference to the record where support for their statements may be found. In fact, a review of the record indicates that Mr. Altemose's failure to appear resulted in a verdict being directed in favor of two defendants on the charge of firing personal property. The record in this case comprised over 10,000 pages. On many occasions, both parties to this appeal referred in their briefs to parts of the record without citing the pages in the record where those parts appear. This practice is completely contrary to the mandate of Pa.R.A.P. 2132 and has resulted in the unnecessary expenditure of effort by this already overburdened court. *I would warn the attorneys of this Commonwealth that the requirements of Pa.R.A.P. 2132 must be strictly followed. If counsel for the appellant fails to comply with Pa.R.A.P. 2132 in raising an issue before this court, then that issue will be deemed waived. If counsel for the appellee fails to comply with Pa.R.A.P. 2132 in answer to an issue raised before this court, then counsel's position on the matter will be disregarded.*

**30.** Defense counsel did not request a mistrial or object to the trial judge's proposal to correct the prosecutor's statement in his charge to the jury.

"THE COURT: I think it is correct that the failure to call Mr. Altemose did, in fact, as Mr. Simone says, result in a demurrer being sustained. So that I think it is unfair to say that he was totally unnecessary, Mr. Nicholas.

MR. NICHOLAS: All right, sir.

MR. PERUTO: Well, sir, I ask that the Jury be instructed so they are not left with that impression that has been falsely given, that has been unfairly given.

THE COURT: All right, I will consider that in my charge. (Side-bar conference concluded.)"

The appellants next contend that the following remarks of the prosecutor were calculated to inflame the passions and prejudices of the jury.

"And it is proper for you to consider it. Because if the Building Trade, and if, specifically, Local 30 was engaged in a life and death struggle with the Altemose Construction Company, *their words*, a life and death struggle, the one side wants to kill the other side by definition. That's a life or death struggle. And if the union wants to kill Altemose, they can only act through their members. And so it is perfectly proper to show their membership in the union by way of showing their motivation, their intent. That's not guilt by association. I don't ask you to convict them solely because they are members of the union. But it is an element for you to consider as to their motivation." (emphasis added)

"So bent were these persons upon the completion of their assigned task, and that is to lay waste to this site, and serve notice on Altemose and any other non-union builder, you desire to build a site this big, Buddy, you better get union people or not build it. And so intent were they in accomplishing that purpose that when the police attempted to stop rioters from harming security guards, and you heard Ingoldsby [Commonwealth witness], they were ready to let loose, dead aim, on one of the guards, and he intervened to stay the hand, and what happened, he was immediately surrounded. Kill the cops. That's what you get for—with us. When the police are the objects, and Mr. Peruto dismisses it, the law doesn't fool around with trifles. Well, you saw the hat. Is this a trifle, a policeman doing his duty, manhandled in that fashion? Sergeant Brennan with his back to the fence, going to protect that property. Get away from that fence, Buddy, its going. No respect for law. None whatsoever. This was total anarchy."

The appellants were not prejudiced by these remarks. The first remark by the prosecutor concerning a "life or death struggle" between the union and Altemose was only respon-

sive to statements made by defense counsel.[31] "Appellants cannot complain of remarks which were invited or provoked by the argument of the defense where such remarks were not excessive but were justified replies." *Commonwealth v. McHugh*, 187 Pa.Super. 568, 574, 145 A.2d 896, 900 (1958); *see also Commonwealth v. Wiggins*, 239 Pa.Super. 256, 361 A.2d 750 (1976). The second remark by the prosecutor constituted proper review of the evidence and deductions therefrom. The prosecutor did not exceed the limits of fair argument. Certainly, the remarks would not have caused the jury to form a fixed bias against the defendants.

The appellants further contend that they were prejudiced by the prosecutor's statement that Mr. Haas, a Commonwealth witness, was "subjected to, at times, I regret to say, brutal cross-examination." This contention is without merit. There is no doubt that Mr. Haas was intensely questioned by the defense attorneys. The prosecutor's remark was therefore, at most, mildly improper and not such that its unavoidable effect would be to prejudice the jury.

Finally, the appellants allege that the prosecutor usurped the function of the jury by expressing his own belief as to the identity of individuals depicted in the photographs of the Plaza site. For example, the appellants complain of the following remarks:

"Let the record show that I [prosecutor] am circulating to the Jury Commonwealth Exhibit C–62, C–63, C–14 and C–14A (distributing abovementioned exhibits to the Jury). And recall to the Jury at this time that Schutter, Ferlick, Cannon all identified Moffo's clothing as the pork-pie hat, the dark sweatshirt, the gray checkered trousers and smoking a cigar. And I ask you to look at those photographs and look at the man seated against the far wall. And I suggest to you that there is no doubt that that's who that is.

**31.** Mr. Simone, in his closing argument, recited the violent acts which occurred at the riot and stated:

"[T]here is no doubt that the union and Altemose were involved in a life and death struggle, and they are still involved in a life or death struggle."

And let the record show further that I am showing to the Jury Commonwealth Exhibit C–19–B and Commonwealth Exhibit C–19. C–19 being the original full frame of Mr. Hahn's photograph, and 19B being a blowup, and I direct the Jury's attention to this individual—I'll show it to Counsel—and submit to this Jury that that is Mr. Moffo and his hands are on the fence and he is knocking it down (distributing exhibits among the Jury)."

The prosecutor's remarks were not improper.

The appellants do not contend that the trial judge abused his discretion by permitting the photographs in question into evidence. Rather, they allege only that the prosecutor incorrectly assumed the role of an identification witness. In *Commonwealth v. Russell*, 456 Pa. 559, 563, 322 A.2d 127, 129 (1974), the Pennsylvania Supreme Court proclaimed that prosecutors may not ". . . express their personal opinion or beliefs on issues which are within the province of the jury, when such opinions are not based on fair arguments from the evidence presented." Here, the prosecutor's statements constituted not reversible error, but rather fair deductions from matters in evidence.

As previously stated, each of the photographs presented by the Commonwealth of the riot scene portrayed a number of people. Although the prosecutor displayed certain of these photographs to the jury in his closing argument and directed the attention of the jury to certain individuals depicted in the photographs, the record clearly reveals that the prosecutor did not, as appellants contend, "tell the jury who was depicted in the photos . . . ." Instead, the prosecutor merely asked the jury to compare the features of those individuals pointed out by him with the features of the defendants as they appeared in court. The conclusion as to whether or not the individuals depicted in the photographs were the defendants was indisputably left to the jury. The prosecutor made clear to the jurors that his remarks concerning the individuals shown in the photographs were only inferences which the jury was free to reject. He emphasized that the identification of the individuals in the photo-

graphs was solely within the province of the jurors. Under these circumstances, I can not conclude that the prosecutor's remarks were so impermissibly suggestive as to be conducive to misidentification. *See U. S. v. Hardy,* 451 F.2d 905 (3rd Cir. 1971); *U. S. v. Hobbs,* 403 F.2d 977 (6th Cir. 1968); *U. S. v. Sanders,* 322 F.Supp. 947 (E.D.Pa.1971), *aff'd,* 459 F.2d 86 (3rd Cir.), *cert. denied,* 409 U.S. 860, 93 S.Ct. 146, 34 L.Ed.2d 106 (1972).

In addition to all of the above-stated considerations, the fact that the jury acquitted two of the defendants is a significant indication that no prejudice resulted to the appellants from any of the alleged improper prosecutorial remarks. *See Commonwealth v. McHugh, supra.*[32]

V

The appellants contend that the trial judge, in his charge to the jury, improperly corroborated the prosecutor's "opinion" that "all the Appellants were in fact depicted in the photographs . . . ." This contention is meritless.

The trial judge instructed the jury, in part, as follows:

"In order to establish or corroborate the identification of certain of the defendants, to wit, Reeves, Moffo, Mangini, Ford and Henry, the Commonwealth has introduced photographs taken by Ditmar Hahn, A. Richard Astheimer, and Corporal Thomas of the Pennsylvania State Police. The photographs of Mr. Hahn purport to depict the scene along the fence which separated the property of his employer, SKF, from the easternmost boundary of the Altemose Construction Site. In determining the question of whether or not among the persons depicted in Mr. Hahn's photographs are any of the defendants, you may consider the size, coloration, clothing, stature, facial features, general appearance of the persons depicted in such photographs. You may further compare Mr. Hahn's photographs with those taken by Corporal Thomas of the State

---

32. The appellants also allege that the prosecutor "misled" the jury as to the legal effect of statements made by co-conspirators. This allegation is without merit.

Police and Mr. Astheimer together with the physical appearance of the defendants as they sat before you in Court in determining the question of identification by such photographs. While you must of course be satisfied of the defendant's identity beyond a reasonable doubt, you may compare the photographs and the appearance of the defendants in Court to reach the conclusion that the defendants and the men in the photographs were one and the same or were not one in the same."

It is quite clear from a reading of this instruction that the trial judge did not express an opinion as to the identity of the individuals depicted in the photographs. In fact, the trial judge specifically cautioned the jurors that:

"I mentioned photographs in my Charge to you, indicating that it was the Commonwealth's contention that some of these photographs depicted some of the defendants. You understand, of course, Members of the Jury, that I do not express any opinion nor did I intend to express any opinion that any of the defendants are or are not depicted in the photographs. That is exclusively a matter for you to determine."

I agree with the trial judge that he was merely suggesting a possible approach the jury could take when deliberating. Moreover, this suggestion was not improper. The jury was entitled to compare the photographs in evidence with the defendants. See U. S. v. Hardy, supra.

## VI

The appellants next allege that the lower court committed reversible error by refusing to compel the prosecution to disclose the identity of an informant. This contention is without merit.

Prior to trial, the defendants requested that the lower court order the prosecution to divulge the names and whereabouts of all informers who had witnessed the Plaza riot. Testimony regarding such disclosure was adduced during a suppression hearing which began on November 29, 1973. After the hearing, on December 7, 1973, the trial judge

ordered the prosecution to disclose to the defendants the names of all known eyewitnesses to the riot. Pursuant to this order, the prosecution, on December 10, 1973, furnished such a list to the defendants. The list contained the names and addresses of sixty-one people, including both policemen and civilians.

During the suppression hearing, the prosecution called one Michael Marino to the witness stand. Mr. Marino, an attorney and a former F.B.I. agent, had been retained by Altemose to investigate the Plaza incident. Immediately after being retained, Mr. Marino sought to coordinate his investigatory efforts with those of the Montgomery County District Attorney, the Upper Merion Township Police Department, and the Pennsylvania State Police. Mr. Marino directed his investigation from a conference room, fitted with special locks to secure the storage of evidence, in the Altemose office building. Mr. Marino frequently met there with law enforcement officials to share information.

Mr. Marino testified that during the course of his investigation, he placed an advertisement in a local newspaper seeking information concerning the Plaza incident.[33]  In response to this advertisement, Mr. Marino was contacted by an individual who would identify himself only under the alias "John Smith." Although he met twice with "John Smith," Mr. Marino stated that he was unable to ascertain Smith's true identity or whereabouts. Mr. Marino also stated that Smith provided him with no evidence which would be helpful to the defendants or which was inconsistent with other evidence obtained by him. On the basis of these statements, the trial judge concluded that the prosecution would be unable to provide the defendants with any information concerning the identity or address of John Smith.

On February 5, 1974, the prosecution called Mr. Marino to testify at trial. During cross-examination, Mr. Marino proclaimed that he did know the true identity of John Smith.

33. The advertisement also contained an offer of reward for pertinent information.

The trial judge ordered Mr. Marino to reveal Smith's real identity, but Mr. Marino refused to do so. The trial judge, in response to defense counsel's motion that Mr. Marino be held in contempt, adjourned the proceedings to allow Mr. Marino to retain counsel.

On February 6, 1974, Mr. Marino testified during an in camera proceeding that shortly after his second meeting with Smith he reviewed a group of photographs possessed by Trooper Joseph Moran of the Pennsylvania State Police. Mr. Marino remarked to Trooper Moran that he believed the informer was shown in one of the photographs. Several weeks later, Trooper Moran revealed the identity of the informer to Mr. Marino. Mr. Marino explained his failure to relate his knowledge of Smith's identity at the suppression hearing by stating that he simply did not recall at that time that Trooper Moran had revealed Smith's real name to him. Mr. Marino testified that he only remembered what Trooper Moran had told him when he returned to his office after testifying at the suppression hearing. Mr. Marino further stated that several days later he informed the prosecutor of his recollection. Mr. Marino did not reveal Smith's identity to the prosecutor. Neither the prosecutor nor Mr. Marino informed the trial judge that Mr. Marino's prior testimony was inaccurate. On February 8, 1974, the trial judge ruled that Mr. Marino need not disclose the name of the informer on the basis of the prosecution's privilege to withhold the identity of an informer.[34]

The trial judge's decision was influenced by Mr. Marino's assertions that Smith did not provide him with any evidence at all concerning the defendants. Mr. Marino explained:

> "The man did not tell me anything about the incident that day. We had these photographs. We turned the photographs, and I asked him, 'Do you know any of these people?' We didn't know who they were. And he said, 'That is so-and-so, and that is so-and-so.' He didn't say, 'I

34. Even though Mr. Marino was not a law enforcement agent, the appellants do not now contend that the privilege afforded the Commonwealth to preserve the identity of an informant is not applicable in the instant case. We need not therefore address this issue.

saw him doing this or that or the other thing.' That is all he said. He put names on faces, period." (NT 1341a)[35] Mr. Marino continually emphasized that Smith neither identified any of the nine defendants nor provided any information which would exonerate the defendants.

The purpose behind the privilege of the prosecution to withhold the identity of an informer ". . . has been to further and protect the public interest in effective law enforcement. It is felt that this recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to the police, and by preserving their anonymity, encourages them to perform that obligation." *Commonwealth v. Garvin*, 448 Pa. 258, 266, 293 A.2d 33, 38 (1972); *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). While the prosecution has traditionally been privileged to withhold the identity of an informer, the courts of this nation have recognized that the scope of this privilege is not unlimited. *E. g., Roviaro v. United States, supra; Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967). For example, the United States Supreme Court has stated:

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action." *Roviaro v. United States, supra*, 353 U.S. at 60–61, 77 S.Ct. at 628.[36]

**35.** Mr. Marino later stated that the informant identified only two people. Smith was paid approximately five hundred dollars for his information.

**36.** The Supreme Court also stated that:
"[W]here the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. (footnote omitted) Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."

Thus, " '. . . no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.' " *Commonwealth v. Carter, supra,* 427 Pa. at 59, 233 A.2d at 287, *quoting Roviaro v. United States, supra,* 353 U.S. at 62, 77 S.Ct. 623. After applying this "balancing test" to the facts in the instant case, I find that the trial judge did not err by refusing to compel the disclosure of the informer's name.

This court has often stated that: "The defendant has the burden of producing evidence in support of his motion for disclosure. A mere allegation that the informant's testimony might be helpful will not suffice." *Commonwealth v. Pritchett,* 225 Pa.Super. 401, 407, 312 A.2d 434, 438 (1973); *e. g., Commonwealth v. Williams,* 236 Pa.Super. 184, 345 A.2d 267 (1975). Although the defendant is not required to predict exactly what the informant will say on the stand, he must show a " '. . . reasonable possibility that the anonymous informer could give evidence that would exonerate him.' " *Commonwealth v. Pritchett, supra,* 225 Pa.Super. at 408, 312 A.2d at 438, *quoting Price v. Superior Court,* 1 Cal.3d 836, 83 Cal.Rptr. 369, 463 P.2d 721 (1970). The appellants arrive at their conclusion that disclosure of the informant's identity would have been "relevant and helpful" to their defense in the following manner. First, the appellants state that the informant was present "during the crucial period." Because of this, the appellants deduce that "it is very possible that the informant could actually identify some of the Appellants as 'merely' being present at the Altemose construction site and having no connection with the alleged illegal incidents." Obviously, the appellants' conclusion constitutes gross conjecture.

*Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).

The record shows that the informant provided no evidence either for or against the appellants. He merely identified two men, neither of whom was a defendant, who were depicted in a photograph of the riot scene. There is nothing in the record to demonstrate, or even suggest, that the informant was aware of the appellants' presence at the Plaza site. Furthermore, this is not a case where we would be ". . . reluctant to permit the establishment of facts crucial to criminal guilt solely by police testimony based on a single observation *where testimony from a more disinterested source is available.*" (emphasis in original) *Commonwealth v. Carter, supra*, 427 Pa. at 61, 233 A.2d at 288. The evidence against most of the appellants consisted not only of police testimony, but also of photographs taken of the Plaza site during the riot. Moreover, the informant was not the only eyewitness at the scene. Approximately one thousand people were present at the Plaza site on June 5. In fact, the Commonwealth provided the defendants with a list containing the names of sixty-one eyewitnesses. There is always the possibility that an informant who was present at the scene of a crime might be able to give evidence to exonerate an accused. The appellants, however, have failed to show that that possibility in this case was reasonable rather than remote. I find nothing in the record which would compel this court to weigh the balance in favor of disclosure.

## VII

The appellants next contend that they were denied a fair trial by the prosecutor's failure to disclose that Mr. Marino had testified falsely at the suppression hearing as to his knowledge of the informant's true identity. I find no evidence of prosecutorial misconduct which warrants a new trial.

In the landmark decision of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court proclaimed that ". . . the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evi-

dence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [37] *Accord, Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977); *Commonwealth v. Powell,* 449 Pa. 126, 295 A.2d 295 (1972); *Commonwealth v. Jennings,* 225 Pa.Super. 489, 311 A.2d 720 (1973). In *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972), the Supreme Court delineated the following standards by which the prosecution's conduct is to be measured under a *Brady* claim: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

As previously stated, Mr. Marino testified at the suppression hearing that he knew the informant only by the alias "John Smith." After he had testified, however, Mr. Marino recalled that Trooper Moran had revealed to him the informant's true name. Several days later, Mr. Marino informed the prosecutor that his prior testimony was not correct, but he did not disclose the identity of the informant to the prosecutor. Neither the prosecutor nor Mr. Marino informed the trial judge that Mr. Marino's prior testimony was false. Since the defendants had timely requested that the names of all known eyewitnesses be disclosed, the first requirement enunciated in *Moore* has been satisfied. However, it is clear that the evidence suppressed was neither favorable to the defense nor material to either guilt or punishment.

After Mr. Marino testified at trial that he did know the informer's identity, the trial judge conducted a hearing to determine if the informer's identity should be disclosed to the defendants. Evidence adduced at this hearing indicated that the informant could give no evidence at all concerning

37. The ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, the Prosecution Function, § 3.11(a) (Approved Draft, 1971), provides: "It is unprofessional conduct for a prosecutor to fail to disclose to the defense at the earliest feasible opportunity evidence which would tend to negate the guilt of the accused or mitigate the degree of the offense or reduce the punishment."

the defendants. The trial judge therefore ruled that disclosure was not necessary because the evidence presented by the informant was not relevant and helpful to the defendants. As previously stated, I find no reason to reject this evidentiary finding. At best, therefore, the suppressed evidence could reflect only upon the credibility of the witness, Marino. Although the suppression of such evidence may result in the denial of a fair trial to an accused, *see Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the appellants were not denied the opportunity to attack the credibility of Mr. Marino. On numerous occasions during the cross-examination of Mr. Marino at trial, the defendants were allowed to emphasize the inconsistency of Mr. Marino's testimony concerning his knowledge of the informant's identity. I conclude that the appellants were not denied a fair trial by prosecutorial misconduct.[38]

## VIII

The appellants next contend that they are entitled to a new trial because the verdict against them was the product of an overworked and fatigued jury. The record, however, does not substantiate this claim.

The jury, after being sequestered, began its deliberations on April 8, 1974, at 3:33 p. m. The jury continued its deliberations that day until 10:15 p. m. when it retired to a local hotel.[39] Deliberations resumed the next morning. At 3:30 p. m., the trial judge, with counsel's approval, inquired of the jury whether overnight accommodations would be needed. He received a negative reply. The jury recessed for dinner at 3:30 p. m. and returned approximately two hours later. At that time, the trial judge was informed that one of the jurors, Delores Nicola, had become acutely ill at

**38.** Although I do not believe that the appellants were denied due process, I do not condone the failure of either the prosecutor or Mr. Marino, a private attorney, to correct a statement of record. Both men, as officers of the court, had a duty to inform the trial judge that Mr. Marino's testimony was erroneous.

**39.** The jury did recess from 5:45 p. m. until 8:15 p. m. for dinner.

the restaurant. Because Ms. Nicola was still in discomfort, the trial judge, after consulting with opposing counsel, ordered the entire jury, accompanied by tipstaves, to be taken by three Sheriff's vans to the Emergency Ward of the Montgomery Hospital. The trial judge, with his law clerk, also proceeded to the hospital where he observed that the jury and its tipstaves had been placed in the "Fracture Room" of the Emergency Ward. A Deputy Sheriff was posted outside this room.

Ms. Nicola, meanwhile, was examined by a physician who concluded that she was suffering from viral gastroenteritis (inflammation of the stomach and intestines) and pharyngitis (inflammation of the throat). Ms. Nicola was given medication [40] by a physician who assured the trial judge that Ms. Nicola would not only be able to return to the hotel that evening but would also be able to resume deliberating with the jury in the morning. Another juror, Emil Mott, had also felt ill during the day and had taken two aspirins. While Ms. Nicola was being treated, another physician examined Mr. Mott who was also diagnosed as having viral pharyngitis. Mr. Mott was then given some medication by the physician.[41]

After the two jurors had been treated, the entire jury was transported to a hotel for the evening. The trial judge instructed the tipstaves to contact him immediately at home if there was a change in anyone's condition. The trial judge particularly instructed the tipstaves to contact him if Ms. Nicola would be too ill to continue. At 8:30 a. m., the following day, the trial judge was informed that Ms. Nicola had recovered. The jury resumed its deliberation shortly before 10:00 a. m. and rendered a verdict at 3:40 p. m. that day.

40. Ms. Nicola was given medication in the form of an injection (ten milligrams intramuscularly of Compazine) and a pill (Donnatal). She also received a prescription for Polycillin (five hundred milligrams every twelve hours).

41. Mr. Mott received a prescription for Polycillin and some Donnatal.

The appellants contend that neither Ms. Nicola or Mr. Mott, "because of their illnesses and treatment therefore, could . . . have rendered a free and independent verdict." They further contend that "deliberations under the conditions present produced a verdict that was the product of an overworked and fatigued jury." The record simply does not support these claims.

In *Commonwealth v. Campbell,* 445 Pa. 488, 495–96, 284 A.2d 798, 801 (1971), the Pennsylvania Supreme Court stated that: "The length of the deliberation of a jury is wisely left to the sound discretion of the trial judge, and we reverse only if we find a clear abuse of discretion, or that the verdict was the product of coercion or of an overworked and fatigued jury." *See also Commonwealth v. Moore,* 398 Pa. 198, 157 A.2d 65 (1959). Certainly, the physical illness of a juror may be of such a nature as to bring into question the validity of a verdict. Here, however, no such question arises.

Both Ms. Nicola and Mr. Mott were promptly treated for their illnesses. The attending physician assured the trial judge that Ms. Nicola, whose condition was apparently worse than Mr. Mott's, could continue her deliberations with the other jurors. On the following day, the trial judge was reassured that Ms. Nicola "felt fine." Similarly, neither Mr. Mott nor any other juror gave any indication that he would be unable to continue. "It is very significant that the jurors made no complaint nor any request that their deliberations be suspended and that they be given an opportunity to rest." *Commonwealth v. Moore, supra,* 398 Pa. at 205, 157 A.2d at 69–70. I find nothing in the record to justify the conclusion ". . . that the verdict was not the unanimous will of twelve persons free from the demands of disabling Nature clamoring for rest." *Commonwealth v. Moore, supra,* 398 Pa. at 209, 157 A.2d at 71 (dissenting opinion by Musmanno, J.)

## IX

The appellants lastly contend that "the intense pre-trial publicity, the failure to compel the Commonwealth to dis-

close the identity of the informant, the failure of the trial court to sequester the jury, the prosecutorial misconduct during the trial and the prejudicial closing argument by the District Attorney, operating together, deprived the appellants of a fair trial." I have already conducted an exhaustive examination of each of these issues individually and have determined that none of these claims warrants a finding in favor of the appellants. The trial of the appellants was extensive, sometimes heated, but always fair.

I would therefore affirm the judgment of sentence.

JACOBS, President Judge, joins in this dissenting opinion.